PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

No. 04-5094

TRUNG HUU TRUONG,

Defendant-Appellant.

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA
(D.C. NO. 03-CR-174-H)**

Robert Ridenour, Assistant Federal Public Defender (Barry L. Derryberry, Research and Writing Specialist, with him on the briefs), Tulsa, Oklahoma, for Defendant-Appellant.

Robert T. Raley, Assistant United States Attorney (David E. O'Meilia, United States Attorney, with him on the briefs), Tulsa, Oklahoma, for Plaintiff-Appellee.

Before **KELLY**, **HARTZ**, and **McCONNELL**, Circuit Judges.

**McCONNELL**, Circuit Judge.

Trung Huu Truong was charged with possessing and distributing

pseudoephedrine knowing or having reasonable cause to believe it would be used

to manufacture methamphetamine in violation of 21 U.S.C. § 841(c)(2), and with possessing pseudoephedrine and ephedrine knowing, intending or having reasonable cause to believe that they would be used to manufacture methamphetamine in violation of 21 U.S.C. § 843(6). A jury convicted him on both counts. Mr. Truong appeals his conviction, arguing the evidence was insufficient to support it, and appeals his sentence on various grounds. We conclude the evidence was insufficient to support Mr. Truong's conviction, and therefore do not reach issues related to his sentence.

## I.

There is no dispute in this case that the defendant, Mr. Truong, sold very large quantities of ephedrine or pseudoephedrine to various people on numerous occasions. The question is whether he knew, or had reason to believe, that the substance he sold would be used to manufacture methamphetamine. The government bore the burden of proving such knowledge beyond a reasonable doubt. Because of the nature of the question, we recount the facts of the case in detail.

On the evening of July 19, 2001, Officer Donnie Deramus of the Tulsa Police Department saw Shane McLain, whom he knew to have an expired driver's license, leave a Texaco station and drive away in a truck. Officer Deramus pulled Mr. McLain over and arrested him. Mr. McLain had left the Texaco station

2

carrying two styrofoam cups with lids and straws; a search of the truck incident to Mr. McLain's arrest revealed that one of the cups contained a sealed, unmarked pill bottle. Officer Deramus opened the bottle, discovering what appeared to him to be pseudoephedrine or ephedrine pills. Mr. McLain identified a Mr. Truong, who worked in the Texaco station, as the person who had sold him the pills.

The next night, Officer Deramus and other officers returned to the Texaco station and confronted Mr. Truong, who admitted to having sold a thousand-count bottle of pseudoephedrine to Mr. McLain the night before. The only pseudoephedrine on display in the store was a single box filled with bags of six sixty-milligram tablets, but when Officer Deramus asked Mr. Truong if there was any other pseudoephedrine in the store, Mr. Truong pointed down behind the cash register. There were ten unmarked bottles in the area Mr. Truong indicated, each of which contained one thousand approximately 50 milligram pseudoephedrine pills. Officer Deramus asked Mr Truong if he sold pseudoephedrine, and Mr. Truong indicated that he had sold one of the large bottles to Shane McLain for $300. Officer Deramus asked for permission to search the store, which Mr. Truong gave. Officer Deramus then asked if there was any more pseudoephedrine or ephedrine in the store, and Mr. Truong directed him to a storage closet, which contained $2921 in a cigar box, numerous small containers of ephedrine and pseudoephedrine, and twelve large unlabeled bottles, similar to the ten bottles

3

under the counter. All told, there were 43,200 pseudoephedrine and ephedrine pills in the storage room, as well as "other items of inventory."[1]

Mr. Truong was arrested and transported to a police station, where he signed a waiver form and gave a statement. Mr. Truong told the police he had obtained the large bottles of pseudoephedrine from a man who brought them to the store periodically, and who would permit Mr. Truong to pay for the drugs after he had sold them. Mr. Truong said he did not know the man's name or how to contact him, but that the man would come to the store every month or so. Mr. Truong admitted to the police that he did not keep records of the sales he made of pseudoephedrine. Mr. Truong also informed the police that he did not know the purpose to which the pills would be put after he sold them.

Three government witnesses testified at trial that they had purchased large quantities of pseudoephedrine from Mr. Truong. Shane McLain testified that he began purchasing pseudoephedrine from Mr. Truong in the winter of 2000, buying flats containing twelve sixty-count bottles of pseudoephedrine for $300. Mr. McLain bought the flats once a week or every other week and purchased a single

---

[1]The extent to which the storeroom held other items of inventory is not altogether clear from the record. On cross-examination, Officer Deramus responded in the affirmative when defense counsel asked if the storeroom held "other items of inventory . . . cigarettes, pop, and so on." R. Vol. V 119. On re-direct, however, when asked if there were "cartons of cigarettes, cartons of cups, cartons of other wares" in the storeroom, Officer Deramus replied that there were not. *Id*. at 126.

4

flat fifteen to twenty times. Mr. McLain also testified to purchases of multiple flats: two flats two or three times; three flats two or three times; five flats five or six times. All sales were cash sales, although on a few occasions Mr. Truong "fronted" Mr. McLain the pills, allowing him to take the pills and pay for them later.

In March 2000, Mr. McLain and Brandi Rosencutter, another prosecution witness, found a 1000-count pseudoephedrine bottle in an abandoned house and took it to Mr. Truong to see if he could obtain the larger bottles. Mr. Truong did so, and Mr. McLain began to buy the large bottles for $420 each, purchasing one bottle at a time on two occasions, two bottles twice, three bottles once, five bottles two or three times, eight bottles once, and ten bottles twice. Although Mr. Truong did not "front" Mr. McLain the larger bottles, when Mr. McLain did not have the full amount to buy the larger bottles, Mr. Truong would allow him to pay the remaining amount later.

These sales took place under unusual circumstances. While Mr. McLain initially made his purchases during the day, he later began to buy pills shortly after the store closed. Mr. McLain would knock on the locked door of the store after the exterior lights had been turned off, and Mr. Truong would admit him and sell him pills. Mr. McLain invariably paid cash for the pills, the sales were not rung into the cash register, and Mr. McLain did not receive a receipt. When Mr.

5

McLain purchased soft drinks or cigarettes in addition to the pseudoephedrine, the other items were rung into the cash register. The bottles did not have price tags on them. On one occasion, Mr Truong packaged Mr. McLain's purchase so as to conceal its nature; the night Mr. McLain was arrested, Mr. Truong placed a single large bottle of pseudoephedrine in a styrofoam cup with a lid and straw. These measures do not appear to have been the product of any explicit agreement to conceal Mr. McLain's purchases; Mr. McLain testified that he "couldn't say that [he] and [Mr. Truong] really ever had a conversation" about anything. R. Vol. V 154.

Shane McLain's nephew, Kevin McLain, also testified that he bought pseudoephedrine from Mr. Truong. He began by buying two or three packets of "tear-outs" once or twice a week, and after a few weeks progressed to buying whole boxes of the tear-out packages for $90. He continued to buy the whole boxes once a week for five or six months and then began to buy the thousand-count bottles, buying four or five in the month before Mr. Truong's arrest.

Like his uncle, Kevin McLain made his purchases under unusual circumstances. Neither the whole boxes nor the large bottles were on display in the store. He made his purchases when no one else was in the store and invariably paid cash. The large bottles did not have labels or prices on them. He did not receive receipts for purchases of the large bottles, although he sometimes

6

received receipts for the whole boxes. Kevin was unsure if sales for the large bottles were rung into the cash register. On the four or five occasions on which he bought a large bottle, Mr. Truong placed the bottle in a styrofoam cup with a lid and sometimes a straw.

Like his uncle, Kevin McLain did not discuss the manner in which he made his purchases with Mr. Truong:

> Q. When you made these purchases, was there anybody else in the store?
> A. No.
> Q. Was that by design?
> A. I wouldn't ever come into—I wouldn't ever go in the store while people was in there. I would wait, you know, until everybody left before I went in to ask, to ask him for them.
> Q. Well, why is that?
> A. Because I was paranoid. I was high. Just, it's something I did. Not wanting to get into any trouble.

R. Vol. V. 244. Kevin McLain never discussed his secretive behavior or the reasons for it with Mr. Truong; indeed, his testimony cast doubt on Mr. Truong's ability to understand such a conversation should either of the McLains have attempted it:

> Q. And did you have a conversation or did the defendant tell you about these [large] bottles?
> A. He just said he had the thousand lot pretty much. There wasn't a real conversation about it. He said he didn't have the tear-out box but he had those.
> Q. And he was speaking in English?
> A. He was trying to, yeah. . . .
> Q. Did he understand you?
> A. I'm not sure if he did or not.

7

R. Vol. V. 248–249.

Mr. Truong also sold pseudoephedrine to Shane McLain's friend, Brandi Rosencutter. Ms. Rosencutter testified that Shane McLain introduced her to Mr. Truong in early 2001 and that she began to buy between five and six sixty-count bottles a few times a week. Ms. Rosencutter corroborated Shane McLain's story of finding a thousand-count bottle in an abandoned house and testified that she went with Mr. McLain to show the bottle to Mr. Truong. A few weeks after she showed Mr. Truong the bottle, she began to buy one or two of the large bottles once or twice a week. She continued to make these purchases for approximately six months, buying, at her estimate, 150 bottles in total. When Mr. Truong was out of the large bottles, Ms. Rosencutter testified that she sometimes bought flats of sixty-count bottles, estimating that she purchased sixty flats during the same period she was buying the larger bottles. When nothing else was available, she also purchased 48-packet boxes of pseudoephedrine and hundred-count bottles.

Ms. Rosencutter's purchases were attended by the now-familiar litany of suspicious circumstances. The bottles were not labeled and had no price tags. The large bottles and flats of smaller bottles were not on display. Ms. Rosencutter never received a receipt and always paid cash. Purchases of pseudoephedrine were not rung into the cash register but other purchases made at the same time were. There is one new element in Ms. Rosencutter's account,

8

however; Ms. Rosencutter stated that Mr. Truong "to some extent" told her not to

make her purchases when other customers were in the store:

> A. If there was people there, he didn't want to sell them to us. You
> know, while there was other people there in the store, we would wait.
> Then if there was people behind the counter with him, he would—he
> wouldn't, you know, he would let us know not to let them know what
> we were doing.
> Q. And how would he do that?
> A. At one point he told me not to ah—
> Q. Do you recall what he said?
> A. Just if he had customers or if there was people behind the counter
> that not to buy from them because, you know, he was the only one to
> buy from.
> Q. Did he ever make any signals of [sic] gestures to you to come
> back or wait until other customers were gone?
> A. Not very often, we mostly—I mostly knew what to do, you know,
> if there were too many people there, I would just come back.
> Q. After you were told once, you knew what to do?
> A. Yes.

R. Vol. V. 299–300. Normally Mr. Truong would put the bottles in a plain brown

bag, but once or twice he put them in a white styrofoam cup with another cup on

top of it, but without a straw.

At the close of the prosecution's case, the defendant moved for a judgment

of acquittal, arguing that the prosecution had offered no evidence to prove Mr.

Truong knew or had reasonable cause to believe that the pseudoephedrine he sold

would be used to make methamphetamine. The trial court reserved ruling on the

motion, and denied it without reasons when the defendant renewed the motion at

the close of his own case.

9

At the close of the evidence, the prosecutor requested a "deliberate ignorance" instruction, which would permit the jury to infer knowledge from acts purposefully taken by the defendant to avoid learning that the pseudoephedrine he sold was likely used to manufacture methamphetamine. *See United States v. Concha*, 233 F.3d 1249, 1252-53 (10th Cir. 2000). After a lengthy discussion, which occupies more than ten pages in the transcript, the district court declined to deliver the instruction on the ground that "there is no record that establishes or that forms the basis for, indicates conduct that includes deliberate acts to avoid actual knowledge of the operant facts."

The jury returned a verdict of guilty on both counts of the indictment.

## II.

We review claims of insufficient evidence de novo, but view the evidence, as well as the reasonable inferences that could be drawn from it, in the light most favorable to the government. *United States v. Rahseparian*, 231 F.3d 1257, 1261–62 (10th Cir. 2000). An inference is reasonable "if the conclusion flows from logical and probabilistic reasoning." *United States v. Jones*, 44 F.3d 860, 865 (10th Cir. 1995). We do not second-guess the jury's determination as to the weight or credibility of the evidence presented at trial. *United States v. Yoakam*, 116 F.3d 1346, 1349 (10th Cir. 1997). Our deference to the jury's evaluation of the evidence is not unlimited, however; the evidence supporting a guilty verdict

10

must raise more than the mere suspicion of guilt, and the jury's inferences must be "more than speculation and conjecture in order to be reasonable." *United States v. Leos-Quijada*, 107 F.3d 786, 794 (10th Cir. 1997). We must therefore chart our course between the permissible inferences the jury may draw from the evidence before it and mere speculation, affirming the verdict if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

The procedural posture of this case limits our consideration of the evidence to that presented in the government's case in chief. Mr. Truong moved for a judgment of acquittal under Rule 29 at the close of the prosecution's case and the trial court reserved its ruling. When a trial court reserves ruling on a motion for judgment of acquittal, its ultimate ruling on the motion must be based on the evidence as it stood when the ruling was reserved. Fed. R. Crim. P. 29(b). Appellate review is similarly limited in scope. *See* Advisory Committee Notes to 1994 Amendments ("[T]he trial court is to consider only the evidence submitted at the time of the motion in making its ruling, whenever made. And in reviewing a trial court's ruling, the appellate court would be similarly limited."); *accord United States v. Finn*, 375 F.3d 1033, 1037 (10th Cir. 2004). We must therefore disregard the evidence, discussed by the government in its brief, that was

11

introduced after the Rule 29 motion.

## III.

The statutes under which Mr. Truong was convicted contain an unusually specific *mens rea* requirement: they prohibit possessing and distributing pseudoephedrine and ephedrine only when it can be proved that the defendant knew, intended, or had reasonable cause to believe it would be used to manufacture methamphetamine. 21 U.S.C. §§ 841(c)(2),843(6). It is not sufficient for the government to prove that the defendant knew, intended, or had reasonable cause to believe that the substance would be abused or would be used illegally. Nor is it sufficient for the government to prove that the defendant was negligent or reckless with respect to the risk that the ephedrine or pseudoephedrine he sold would be used to manufacture methamphetamine. *United States v. Green*, 779 F.2d 1313, 1318-19 (7th Cir. 1985). The government must prove the defendant was aware, or had reasonable cause to believe, that the substance would be used for the specific purpose of manufacturing methamphetamine.[2]

---

[2]The government has not specifically argued that the conviction could be sustained under a theory of "deliberate ignorance." *See, e.g., United States v. Concha*, 233 F.3d 1249, 1252-53 (10th Cir. 2000) (stating that a jury instruction that "knowledge can be inferred if the defendant deliberately blinded himself to the existence of a fact" is appropriate when the government presents evidence "showing the defendant purposely contrived to avoid learning the truth"); *United*

(continued...)

12

On the face of the statute, it might appear that the *mens rea* element of these offenses could be either subjective or objective – that a defendant could be convicted upon proof of actual knowledge or intent (subjective) or upon proof that a reasonable person in the defendant's circumstances should have known (had "reason to believe") that the substance would be used to manufacture methamphetamine (objective). Two circuits have so held. *See United States v. Kaur*, 382 F.3d 1155, 1157 (9th Cir. 2004) ("[c]onsistent with the text of the statute, the [challenged jury] instruction incorporates both subjective and objective considerations. . . . [The defendant] had reasonable cause to believe if she actually knew facts that would alert a reasonable person that the pseudoephedrine would be used to make methamphetamine."); *United States v. Galvan*, 407 F.3d 954, 957 (8th Cir. 2005). But this Circuit has interpreted the "reasonable cause to believe" standard of 21 U.S.C. §§ 841(c)(2) and § 843(6) as "akin to actual knowledge." *United States v. Saffo*, 227 F.3d 1260, 1269 (10th Cir. 2000); *see also United States v. Buonocore*, 416 F.3d 1124, 1133 (10th Cir.

---

[2](...continued)
*States v. Hanzlicek*, 187 F.3d 1228, 1233 (10th Cir. 1999); *United States v. Francisco-Lopez*, 939 F.2d 1405, 1409-1412 (10th Cir. 1991). At trial, the district court denied the government's request for a "deliberate ignorance" instruction on the ground that the record did not support it. R. Vol. VII 502-512. The government does not challenge that ruling on appeal. Any such argument is therefore waived.

13

2005) (approving jury instruction stating the reasonable cause to believe inquiry "is entirely subjective, the inquiry is not to be viewed from the perspective of a hypothetical reasonable person").[3]  In order to convict in this case, therefore, the prosecution had to offer evidence sufficient to allow the jury to infer that Mr. Truong had actual knowledge, or something close to it, that the pseudoephedrine and ephedrine he sold would be used to manufacture methamphetamine.

Ordinarily, the government satisfies this burden by introducing evidence that the defendant had received an official notification or warning regarding the substance, *e.g., United States v. Nguyen*, 413 F.3d 1170, 1175 (10th Cir. 2005) ("the DEA routinely visits convenience stores in [defendant's] area to issue [red] notices . . . warn[ing] that pseudoephedrine can be diverted to criminal drug production and informs recipients about the state and federal laws regarding sales of these products."); *Saffo*, 227 F.3d at 1265 (DEA videotaped meeting in which defendant was shown a DEA "red notice" explaining that criminals make purchases of large quantities of pseudoephedrine in order to manufacture methamphetamine); or by using an undercover agent to engage in conversation with the defendant regarding the connection between the substance and the

---

[3]The Eight Circuit has criticized our interpretation on the ground that it "would effectively equate reasonable cause to believe with actual knowledge and thereby render the 'reasonable cause to believe' phrase redundant." *Galvan*, 407 F.3d at 957.

manufacture of methamphetamine. *See, e.g., Buonocore*, 416 F.3d at 1126 (DEA recorded controlled buy in which purchaser said "the meth cooks must be cookin like crazy" and "I must have had a run, there's a bunch of meth cooks in town, that's what their [sic] using them for"). A defendant's own actions or words may also reveal his knowledge that he is selling precursors that will be converted into a methamphetamine.

The government presented no such evidence in this case. The government offered no direct evidence regarding Mr. Truong's subjective state of knowledge as to the conversion of pseudoephedrine into methamphetamine. Indeed, the only testimony presented in the government's case in chief addressing Mr. Truong's awareness of the connection between the drugs he sold and the manufacture of methamphetamine was Officer Deramus's testimony that Mr. Truong told the police he did not know the purpose to which the pseudoephedrine he sold would be put. No law enforcement agent testified that Mr. Truong had received notice of the fact that pseudoephedrine can be used to make methamphetamine. None of the government witnesses testified to any conversations with Mr. Truong regarding methamphetamine. Indeed, two of the three purchasers testified that they had had no conversations with Mr. Truong on any subject at all, and Kevin McLain's testimony suggested that Mr. Truong's English might have been inadequate to have such a conversation even if it had been attempted. Nor did the

15

government present evidence that knowledge of the connection between pseudoephedrine and ephedrine and the manufacture of methamphetamine was so widespread among persons of Mr. Truong's circumstances that his knowledge could be inferred. Indeed, the only evidence at trial regarding public knowledge that methamphetamine can be manufactured from pseudoephedrine was Officer Deramus's testimony that not everyone knows of the relationship between the two drugs.

To be sure, as Mr. Truong admits in his brief, the government presented an abundance of evidence from which a jury might reasonably infer that Mr. Truong knew that his customers "were up to no good." Defendant Br. 13. The huge quantity and clandestine circumstances of the sales would surely have put any reasonable person on notice that something nefarious was going on. Mr. Truong repeatedly sold pseudoephedrine after his shop closed or when there were no other customers, from which a jury might reasonably infer that Mr. Truong did not wish these sales to be observed. There was ample evidence that the purchasers wished the sales to be secret, which supports the inference that their intended use was illicit. The fact that Mr. Truong purchased the drugs outside ordinary channels from an unknown person, and sold them without the usual packaging and labeling indicates that he was complicit. Repeated cash sales made without generating any records could also support a reasonable inference that Mr.

Truong was attempting to avoid discovery. Finally, a jury could infer from the act of concealing pill bottles in styrofoam cups that Mr. Truong knew selling large quantities of pseudoephedrine was not an innocent activity.

But the unusually specific *mens rea* requirement of 21 U.S.C. §§ 841 and 843 requires more. Presumably because of the large-scale legitimate use of pseudoephedrine as a cold remedy, and a concern about not imposing unreasonable duties or risk of criminal liability on the pharmacies and convenience stores that sell this common product, Congress limited the reach of 21 U.S.C. §§ 841 and 843 to sellers with the actual knowledge or intent (or, in this Circuit, something "akin to actual knowledge") that it would be used to manufacture methamphetamine. In the trial below, the government presented substantial evidence that Mr. Truong was attempting to conceal his sales of pseudoephedrine and ephedrine, and knew or had reason to believe the transactions had an illicit character; but it presented no evidence that Mr. Truong knew that his purchasers would use the substance to manufacture methamphetamine. For all we know from the evidence presented to the jury in the government's case in chief, Mr. Truong may have thought that ephedrine and pseudoephedrine are themselves subject to abuse or that his purchasers were addicted to over-the-counter medications. He could have thought that he and his customers were evading taxes, or that the products were contraband for some

17

reason beyond his ken.  While such motives would hardly redound to Mr. Truong's credit, they are not punishable by the statutes under which he was convicted.

## IV.

The prosecution failed to present sufficient evidence from which a jury could have reasonably inferred Mr. Truong knew or had reasonable cause to believe the drugs he sold would be used to manufacture methamphetamine.  We therefore REVERSE his conviction as unsupported by sufficient evidence.

04-5094, *United States v. Truong*

**HARTZ,** Circuit Judge, concurring:

I concur.  Although the question is very close for me, I can accept the panel's view that there was insufficient evidence to prove that Mr. Truong actually knew that the pseudophedrine he was selling was destined for methamphetamine manufacturing.  I add a few words, however, in the hope that they may help avoid error in the future.

It seems to me that there was ample evidence to convict Mr. Truong if the jury had been properly instructed.  Mr. Truong's surreptitious conduct in selling the pseudophedrine would certainly permit a rational juror to infer beyond a reasonable doubt that he knew the purchasers were using the drug for some unlawful purpose and that if he did not know the specific purpose, he was willfully avoiding that knowledge.  The criminal law is not devoid of common sense.  "'(T)he rule is that if a party has his suspicion aroused but then deliberately omits to make further enquiries, because he wishes to remain in ignorance, he is deemed to have knowledge.'"  *United States v. Jewell*, 532 F.2d697, 700 (9th Cir. 1976) (en banc) (quoting Glanville Llewely Williams, Criminal Law: The General Part, s 57 at 157 (2d ed. 1961) (parenthesis in original)).  If the jury had been given a deliberate-ignorance instruction, the verdict could be sustained.

Indeed, the prosecution requested such an instruction, but the district court

denied the request. We recently affirmed a conviction on the ground that there was sufficient evidence to support a guilty verdict by a properly instructed jury, without our determining whether the evidence supported a verdict based on the instructions actually given, when the prosecution, as here, had unsuccessfully sought the proper instructions. *See United States v. Williams*, 376 F.3d 1048 (10th Cir. 2004). But in this case the government has not argued a deliberate-ignorance theory on appeal, so we need not decide whether *Williams* applies. (We also need not address whether, in the event there was sufficient evidence under a deliberate-ignorance theory, we must remand for a new trial for the jury to decide guilt or innocence under that theory.)

Therefore, with considerable misgivings about the outcome here, I join Judge McConnell's opinion.