GORSUCH, J.,
concurring in part and dissenting in part.
The majority’s analysis proceeds in two movements. The first movement affirms the district court’s dismissal of the charges associated with the George murder. But the second movement sounds a different note, reversing the district court and reinstating the charges associated with the Mudersbach attempted murder. I agree with the second half of the majority’s opinion and join its decision to reinstate the Mudersbach attempted murder charges. Respectfully, however, I submit that the same logic that compels this conclusion also compels the reinstatement of the George murder charges.
I
Mr. Raymond has a long and violent criminal history. It is a history that includes battery, aggravated burglary, armed robbery, violations of drug and gun laws — and now murder. Many of these crimes appear linked to his membership and involvement in the Aryan Brotherhood. The current case against Mr. Raymond started in 2007 when the New Mexico United States Attorney’s Office (USAO) charged him, and a grand jury indicted him, for various crimes in furtherance of Aryan Brotherhood racketeering activity, including the successful murder of Henry George and the attempted murder of John Mudersbach.
According to the USAO’s charging documents, when Mr. Raymond and his associates heard in 2002 that Mr. George had recently spoken to law enforcement officials, they went to Mr. George’s apartment and beat him until he admitted to “ratting.” After extracting his confession, the group took Mr. George into the desert near Rio Rancho, New Mexico, where they forced him to dig a large hole. Mr. Raymond then tried to choke Mr. George to death; when that didn’t work, he or one of his co-conspirators shot and killed Mr. George. Before leaving the scene, the group buried Mr. George in the hole he had dug. A few months later, Mr. Ray *974 mond caught wind that Mr. Mudersbach, a then-incarcerated member of the Aryan Brotherhood, had “snitched” to local authorities about the George murder. As retaliation, Mr. Raymond ordered Jeremiah Looney, another of his incarcerated cohorts in the Brotherhood, to murder Mr. Mudersbach. Mr. Looney responded by attacking Mr. Mudersbach with a barbell, “beating him within an inch of his life.” App. at 54-55.
Mr. Raymond sought dismissal of the USAO’s racketeering charges against him. He argued that the charges were barred by a plea agreement he reached with the government on an unrelated and relatively modest firearms charge in 2004. In the 2004 plea agreement, the USAO promised that it would “not bring additional charges against the defendant arising out of the defendant’s conduct now known to the [USAO].” App. at 44. The district court agreed with Mr. Raymond’s motion and dismissed the 2007 racketeering indictment in its entirety.
II
My colleagues hold that the district court applied an incorrect legal standard in dismissing the charges associated with the Mudersbach attempted murder. I agree. The district court asked “whether any of the essential elements of the” government’s attempted murder charges “originate from conduct known” to the USAO as of the date of the plea agreement in 2004. Maj. Op. at 972. This standard, the majority explains, does not reflect the terms of the parties’ plea agreement, which instead barred the government from bringing new charges “arising out of the defendant’s conduct now known” to the USAO, as of the date of the 2004 plea agreement. Id.
While the difference between these two standards might not seem significant at first blush, as the case played out in the district court the difference proved disposi-tive. The district court dismissed the Mu-dersbach attempted murder charges because an essential element of those charges required the government to prove Mr. Raymond’s participation in a racketeering enterprise — here, as alleged in the indictment, the Aryan Brotherhood. Because the USAO knew Mr. Raymond was a member of the Aryan Brotherhood in 2004, the district court reasoned, dismissal of the Mudersbach attempted murder charges was required. Simply put, the USAO’s knowledge of Mr. Raymond’s status within the Brotherhood, as of 2004, precluded the current prosecution against him. As the majority correctly explains, however, the terms of the plea agreement bar the government from bringing charges that arise from conduct, not mere status, known to the USAO at the time of the 2004 plea.
Having identified this error in the legal standard employed by the district court, my colleagues do not remand the matter back to the district court for application of the correct legal standard in the first instance. They do not because, as they explain, the record before us is clearly devoid of evidence that the USAO knew of any of Mr. Raymond’s conduct in connection with the Mudersbach attempted murder at the time of the 2004 plea. Accordingly, the majority reverses the district court’s decision and orders the reinstatement of the Mudersbach charges against Mr. Raymond.
Ill
The same analysis that leads to the reinstatement of the Mudersbach charges should also lead to the reinstatement of the George charges. The district court analyzed the George charges under the same erroneous legal standard it used when assessing the Mudersbach charges. And, under the correct legal standard, the *975 record contains no more evidence that the USAO, at the time of the 2004 plea agreement, knew of Mr. Raymond’s conduct in connection with the George murder than it did his conduct in connection with the Mu-dersbach attempted murder.
First, the district court applied its erroneous legal standard to both the George charges and the Mudersbach charges. Indeed, the district court’s opinion analyzed the George and Mudersbach charges together, in one section, introducing its incorrect legal standard at the outset of its common discussion. Under the district court’s standard, the USAO’s knowledge in 2004 of Mr. Raymond’s status as a participant in the Aryan Brotherhood was enough to require dismissal of all the charges against him. Thus, if reversible legal error infects the district court’s analysis of the Mudersbach charges (as it does), it no less infects the district court’s treatment of the George charges. The two halves of this whole cannot be peeled apart, and so reversal of the whole case, not just half of it, should follow.
Second, reviewing this case under the correct legal standard, there is no more evidence in the record that the USAO knew, at the time of the 2004 plea, of Mr. Raymond’s conduct in connection with the George murder than it did his conduct in connection -with the Mudersbach attempted murder. Indeed, it knew nothing about his role in either attack. Any contrary conclusion is thus clearly erroneous, and reinstatement of the George charges should follow.
The record in this case reveals that the Assistant U.S. Attorney who struck the 2004 plea agreement with Mr. Raymond testified that he had no knowledge of Mr. Raymond’s involvement in the George murder until after the agreement. App. at 674. Two federal agents involved in the investigation said the same thing. App. at 303, 308. Their testimony was corroborated by a fax date stamp reflecting that state authorities first passed along information linking Mr. Raymond to the George murder only after the 2004 plea deal. App. at 75. And all of this testimony was corroborated by the local investigating officer who explained that he hadn’t consulted with federal authorities about the George murder until well after the plea deal was consummated. App. at 280.
In the face of this proof, Mr. Raymond points to the testimony of his defense attorney, Benjamin Gonzales, who indicated that the USAO, at some point, asked him whether Mr. Raymond might assist with a possible investigation into Mr. George’s “disappearance.” App. at 251. From this, Mr. Raymond asks us to infer that the USAO must’ve known, before the plea agreement, of his involvement in the George murder.
At least two problems confront this argument. In the first place, there is no evidence in the record suggesting that the conversation occurred before, rather than after, the 2004 plea — and thus no evidence that the USAO knew anything of Mr. Raymond’s conduct in connection with the George murder before agreeing to the firearms plea deal. To be sure, Mr. Raymond urges us to defer to the district court’s estimation that the conversation took place before the plea. But for us to uphold the district court’s inference, it “must be [based on] more than speculation and conjecture.” United States v. Truong, 425 F.3d 1282, 1288 (10th Cir.2005) (internal quotation marks omitted). In this case, speculation and conjecture about the timing of Mr. Gonzales’s conversation with the USAO is all we have.
Even if we could overlook this problem, another remains. If the government’s request for help in connection with an investigation into George’s disappearance suggests anything, it suggests that the USAO *976 did not know Mr. Raymond kidnapped and killed Mr. George. If the USAO did know those things, after all, it would hardly have needed to solicit Mr. Raymond’s assistance with its investigation into Mr. George’s “disappearance.” At most, the government’s request for assistance suggests only that the USAO suspected Mr. Raymond of possessing helpful information about George’s disappearance. And under the plea agreement that is not enough. It isn’t enough that the government, Cas a-blanca-style, might have considered Mr. Raymond one of the “usual suspects” to be rounded up and questioned about a disappearance linked to the Aryan Brotherhood. To be barred from proceeding with its indictment, the USAO had to know that Mr. Raymond engaged in the conduct of kidnapping and killing George. There is simply no evidence that it did.
To uphold the district court and dismiss the George murder charges, then, we would have to accept Mr. Raymond’s piling of one speculative inference (that the Gonzales conversation took place before the plea) on another (that the prosecutor’s comments somehow signaled knowledge of Mr. Raymond’s conduct, rather than suspicion of his usefulness as an informant). None of this we can do. See United States v. Hilliard, 31 F.3d 1509, 1521 (10th Cir.1994) (explaining that “[w]e are unwilling to stack inference upon inference” to uphold a district court’s factual findings); cf. United States v. Rakes, 510 F.3d 1280, 1284 (10th Cir.2007) (“[W]e will not uphold a conviction obtained by piling inference upon inference.”). Mr. Raymond asks us to believe that the USAO decided to give Mr. Raymond a free pass on a murder charge, despite knowing he kidnapped and killed Mr. George, in exchange for a guilty plea to an unrelated and relatively modest gun charge. While maybe not an entirely unfathomable scenario, Mr. Raymond fails to provide more than speculation that anything so unlikely actually occurred.
In response to all this, Mr. Raymond stresses that state and local authorities had information linking Mr. Raymond to the George murder before the date of the 2004 plea agreement. But that is not enough either. Under the terms of the plea, the USAO was barred only from pursuing conduct known to it, not conduct known to state and local authorities.
Mr. Raymond replies that law enforcement officials frequently coordinate their investigative work and so the USAO likely knew what state and local authorities knew. But this, too, is just speculation— and speculation contradicted by all of the competent record evidence. Every investigator called as a witness, from every law enforcement agency involved, testified that the USAO received no information on the George murder until after the 2004 plea agreement. To be sure, Mr. Raymond argues that other federal officials, who did not testify, might have learned what state and local authorities knew before the plea agreement. But, yet again, he supplies no evidence to support that speculation. And protesting that the right officials didn’t testify does Mr. Raymond no good anyway. He had the chance to call the witnesses he wished and, as the movant seeking dismissal of the indictment, he bore the burden of proving that the USAO’s charges arise out of conduct it knew of at the time of the plea. Allen v. Hadden, 57 F.3d 1529, 1534 (10th Cir.1995). That he simply did not do.
Moreover, if we could fairly impute the knowledge of state and local officials to the USAO, as Mr. Raymond suggests and the majority seems to agree, we would have to affirm the dismissal not just of the George charges. We would also likely have to affirm the dismissal of the Mudersbach charges. The majority indicates that the only information the USAO knew about Mr. Raymond’s conduct in connection with *977 the Mudersbaeh attack was Mr. Raymond’s status as an affiliate of the Aryan Brotherhood. But there are loads of other things that state and local investigators knew about Mr. Raymond’s involvement in the attack on Mr. Mudersbaeh. They knew that Mr. Mudersbaeh was a member of the Aryan Brotherhood. They knew that Mr. Mudersbaeh had implicated Mr. Raymond in the George murder. And they knew that Mr. Mudersbaeh had been attacked in jail by another Aryan Brotherhood member, presumably for “snitching” on Raymond. If the knowledge of state and local officials about the George murder could be fairly imputed to the USAO, presumably the same should hold true for the Mudersbaeh attempted murder, thus precluding prosecution of either crime. The reason why we can’t impute the knowledge of local and state officials to the USAO in either case, of course, is that any such imputation would be based on speculation. There is simply no evidence in this record that the USAO, as opposed to state and local officials, knew of Mr. Raymond’s involvement in either crime.
* * *
The district court applied the wrong legal standard to both the George and Mu-dersbach charges. Applying the correct standard, the record is clearly devoid of evidence that the Mudersbaeh charges arise from conduct known to the USAO at the time of the 2004 plea agreement. Exactly the same must also be said of the George charges. Accordingly, I would reinstate not just half but all of the indictment against Mr. Raymond.