**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 6, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellant,

v.

BRANDON DAVID MCCARTHY;
RACHEL CHRISTINE MCCARTHY,

    Defendants - Appellees.

No. 25-5026

_____

**Appeal from the United States District Court**
**for the Northern District of Oklahoma**
**(D.C. No. 4:23-CR-00359-SEH)**
_____

Thomas E. Duncombe, Assistant United States Attorney (Clinton J. Johnson, United States Attorney, with him on the briefs), Tulsa, Oklahoma, for Plaintiff-Appellant.

Leah D. Yaffe, Assistant Federal Public Defender, Denver, Colorado (Alan S. Mouritsen of Parsons Behle & Latimer, Salt Lake City, Utah; Virginia L. Grady, Federal Public Defender, Denver, Colorado, with her on the brief), for Defendants-Appellees.
_____

Before **HARTZ**, **TYMKOVICH**, and **EID**, Circuit Judges.
_____

**HARTZ**, Circuit Judge.
_____

The government appeals the dismissal of several charges in an indictment against Defendants Brandon and Rachel McCarthy. The issue before us is whether Defendants can be prosecuted for selling unprocessed poppy seeds, even if they are

not controlled substances, if Defendants knew that the poppy seeds would be used as a precursor to manufacture a controlled substance—namely, poppy-seed tea, which contains opioids. Exercising jurisdiction under 18 U.S.C. § 3731, we reverse the dismissal of the disputed charges.

## I.    BACKGROUND[1]

Under the Controlled Substances Act (the CSA or the Act), 21 U.S.C. § 801 et seq., poppy seeds are explicitly excluded from the definitions of two substances listed as Schedule II controlled substances: *opium poppy* and *poppy straw*. *See* 21 U.S.C. §802(19)–(20) (definitions); 21 C.F.R. §1308.12 (Schedule II). The inside of an opium poppy pod, however, is coated with opium latex, a milky, sap-like substance, which contains opiate alkaloids, including morphine, codeine, and thebaine, which *are* controlled substances. After harvesting, unprocessed poppy seeds—typically marketed as "unwashed," "organic," or "natural"—have some opium latex coating. Aplt. App. 139. The industry standard requires that for poppy seeds to be food-grade, they must be processed to remove the coating.

Defendants Brandon and Rachel McCarthy operated Lone Goose Bakery as an online store primarily selling unprocessed poppy seeds coated in opium latex. Defendants would buy the seeds in bulk and repackage them in smaller bags for their

---

[1] On review of the dismissal of an indictment, we assume the allegations in the indictment to be true. *See United States v. Todd*, 446 F.3d 1062, 1067 (10th Cir. 2006).

customers. Most customers were individuals who purchased the seeds for personal consumption, not bakeries or retail businesses.

Defendants published eBooks and videos about poppy-seed tea. Poppy-seed tea is brewed by steeping large quantities of unprocessed poppy seeds in water to separate out the opium latex. Consuming poppy-seed tea causes effects similar to consuming pharmaceutical opiates and can lead to addiction, unconsciousness, overdose, and death. Defendants' books and videos, which discussed unprocessed poppy seeds sold by Lone Goose Bakery, provided guidance and recipes for making poppy-seed tea. One serving of Defendants' recipes for poppy-seed tea could expose consumers to about one gram of morphine.

Defendants' publications acknowledged that consuming tea from its poppy seeds could cause an opiate overdose. And that happened at least once. In December 2018 a customer purchased two five-pound shipments of unprocessed poppy seeds from Defendants, drank poppy-seed tea, and died from an overdose.

In January 2025 a grand jury of the United States District Court for the Northern District of Oklahoma returned a 41-count superseding indictment against Defendants. All the counts arose out of Defendants' poppy-seed business. Some relied on the contention that the poppy seeds were controlled substances; others relied on the contention that the seeds were precursors for controlled substances. Defendants moved to dismiss all charges on the grounds (1) that the CSA excludes prosecution of the sale and possession of poppy seeds, (2) that if the Act is ambiguous in that regard, the rule of lenity requires dismissal, and (3) the Act is

3

unconstitutionally vague if it is construed to prohibit Defendants' sale and possession of poppy seeds. The district court granted the motion.[2]

The government appeals. It does not challenge the dismissal of "charges predicated upon allegations that [Defendants] distributed and possessed with intent to distribute controlled substances morphine, codeine, and thebaine"; it challenges only "the dismissal of charges predicated upon allegations that [Defendants] distributed and possessed drug precursors." Aplt. Br. at 14. We agree with the government and reverse the dismissal of the challenged counts.

## II.    DISCUSSION

### A.    Statutory Interpretation

The CSA "mak[es] it unlawful to manufacture, distribute, dispense, or possess any controlled substance except in a manner authorized by the CSA." *Gonzales v. Raich*, 545 U.S. 1, 13 (2005) (citing 21 U.S.C. §§ 841(a)(1), 844(a)). To further this mission, the CSA also forbids the possession or distribution of things that are to be used to manufacture controlled substances. *See* 21 U.S.C. § 843(a)(6) and (7). Counts 11 through 17 of the indictment against Defendants charged that they "knowingly and intentionally distributed unprocessed poppy seeds coated in opium

---

[2] Defendants also moved to dismiss on the grounds that poppy-seed regulation was delegated exclusively to the Food and Drug Administration and that they relied on the government's approval of their business since they obtained the poppy seeds in compliance with the Foreign Supplier Verification Program and received a trademark for Lone Goose Bakery. The district court rejected those grounds. Because Defendants do not raise those issues on appeal, we do not consider them.

latex, a *material* used to *manufacture* a controlled substance, knowing, intending, and having reasonable cause to believe that *material* would be used to *manufacture* a controlled substance," in violation of § 843(a)(7); and Count 18 charged that they "knowingly and intentionally possessed unprocessed poppy seeds coated in opium latex, a *material* used to *manufacture* a controlled substance, knowing, intending, and having reasonable cause to believe that *material* would be used to *manufacture* a controlled substance," in violation of § 843(a)(6).[3] Aplt. App. at 153–54 (emphasis added).[4]

---

[3] Under § 843(a)(6) and (7) it is "unlawful for any person knowingly or intentionally":

> (6) to possess any three-neck round-bottom flask, tableting machine, encapsulating machine, or gelatin capsule, or any equipment, chemical, product, or *material* which may be used to manufacture a controlled substance or listed chemical, knowing, intending, or having reasonable cause to believe, that it will be used to *manufacture* a controlled substance or listed chemical in violation of this subchapter or subchapter II; [or]
> (7) to manufacture, distribute, export, or import any three-neck round-bottom flask, tableting machine, encapsulating machine, or gelatin capsule, or any equipment, chemical, product, or *material* which may be used to manufacture a controlled substance or listed chemical, knowing, intending, or having reasonable cause to believe, that it will be used to *manufacture* a controlled substance or listed chemical in violation of this subchapter or subchapter II or, in the case of an exportation, in violation of this subchapter or subchapter II or of the laws of the country to which it is exported[.]

21 U.S.C. § 843(a) (emphasis added).

[4] Although the phrase *having reasonable cause to believe* could be read to say "that the *mens rea* element of [precursor] offenses could be either subjective or objective," this court has interpreted the statute to require the government to show "actual

5

The statutory terms at issue on appeal are *material* and *manufacture*. Defendants argue that the poppy seeds they distributed and processed are not *material* within the meaning of the statute[5] and that the production of poppy-seed tea containing controlled substances is not the *manufacture* of a controlled substance within the meaning of the statute. We disagree.

### 1.   *Plain Meaning*

Because the issue before us is one of statutory construction, our review is de novo. *See United States v. Wood*, 6 F.3d 692, 694 (10th Cir. 1993). "When interpreting the language of a statute, the starting point is always the language of the statute itself." *United States v. Quarrell*, 310 F.3d 664, 669 (10th Cir. 2002).

We first address the meaning of *manufacture*. *See* 21 U.S.C. § 843(a)(6)–(7). Defendants contend that *manufacturing* plainly "'connote[s] . . . the creation of a final product from component ingredients.'" Aplees. Br. at 30 (quoting *United States v. Fields*, 53 F.4th 1027, 1049 (6th Cir. 2022)). Accordingly, they argue that because

---

knowledge, or something close to it." *United States v. Truong*, 425 F.3d 1282, 1289 (10th Cir. 2005).

[5] The government asserts on appeal that unprocessed poppy seeds could constitute a "*chemical, product, or* material which may be used to manufacture a controlled substance." Aplt. Br. at 20 (emphasis added) (internal quotation marks omitted). But the superseding indictment charged only the possession and distribution of "a material." Aplt. App. 153–54. When an indictment charges that a crime was committed in a particular fashion, those particulars "become[] an essential and delimiting part of the charge itself." *United States v. Farr*, 536 F.3d 1174, 1181 (10th Cir. 2008) (Gorsuch, J.). We therefore consider only whether unprocessed poppy seeds may constitute a *material* within the meaning of the statute.

6

the controlled substances already exist on the poppy seed, merely removing the controlled substances into the tea cannot be manufacturing; for example, they say, applying the "common usage" of the term, fruit juices are not *manufactured* from a fruit. *Id.*

This argument ignores the statutory language. The CSA defines *manufacture* to include:

> the production, preparation, propagation, compounding, or processing of a drug or other substance, either directly or indirectly or by *extraction from substances of natural origin*.

21 U.S.C. § 802(15) (emphasis added). "When a statute includes an explicit definition, we must follow that definition, even if it varies from a term's ordinary meaning." *Digital Realty Tr., Inc. v. Somers*, 583 U.S. 149, 160 (2018) (internal quotation marks omitted). We need not determine the full scope of this definition, because the only language of interest here is "extraction from substances of natural origin." 21 U.S.C. § 802(15).

The CSA does not define *extraction*. When a statute does not define a term, "we give the term its ordinary meaning." *Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 85 (2018) (internal quotation marks omitted). The *Oxford English Dictionary* defines *extraction* as including "[t]he action or process of obtaining (the constituent elements, juices, etc.) from any substance by heat, pressure, etc." *Extraction*, *Oxford English Dictionary*, Oxford Univ. Press (online ed. 2026), https://doi.org/10.1093/OED/5161799191 [https://perma.cc/Y48X-N3WB]. Of particular relevance, it defines *water extract* as "[a]n extract of a substance made by

7

dissolving or steeping it in water." *Water Extract*, *Oxford English Dictionary*, Oxford Univ. Press (online ed. 2026), https://doi.org/10.1093/OED/4520155170 [https://perma.cc/JS5P-LM47]. And this notion of *extract* is confirmed by a definition of *infusion* as "[a] dilute liquid *extract* obtained from a substance by soaking it with, or steeping it in, water." *Infusion*, *Oxford English Dictionary*, Oxford Univ. Press (online ed. 2026), https://doi.org/10.1093/OED/8680568360 [https://perma.cc/AUE3-GNPR] (emphasis added).

The indictment alleges that "[p]oppy seed tea is an herbal infusion" created when "large quantities of unprocessed poppy seeds coated in opium latex are steeped in water to remove the opium latex," and the resulting liquid contains several controlled substances (morphine, codeine, and thebaine). Aplt. App. at 139–40. Applying the above definitions, the process of making poppy-seed tea can be described as extracting controlled substances from unprocessed poppy seeds. And under the CSA, "extraction from substances of natural origin" is manufacturing. 21 U.S.C. § 802(15). We therefore must conclude that producing poppy-seed tea is manufacturing.

Our caselaw confirms this usage. In *United States v. Beaulieu*, 900 F.2d 1531, 1534 (10th Cir. 1990), we considered whether there was sufficient evidence that the defendant manufactured amphetamine. Officers searched the defendant's home "and found a single burner heating device, two bottles of brown liquid and glassware." *Id.* at 1532–33. A chemist testified that one bottle contained "a solution of amphetamine dissolved in ether and that sufficient amphetamine existed to extract it from the

8

ether." *Id.* at 1533. And a DEA agent testified that the burner, liquid, and glassware could be used "to manufacture amphetamine by the 'powdering out' process." *Id.* Powdering out was described as a process in which a person "place[s] a clear dish on the heating device along with a small amount of the amphetamine-ether solution. After the heating device evaporated the ether, the resulting white powdery substance would be unlawful amphetamine sulfate." *Id.* We concluded that "a reasonable jury could infer that the defendant *manufactured* amphetamine by using the 'powdering out' process to *extract* amphetamine from ether to produce unlawful white powder amphetamine." *Id.* at 1534 (emphasis added). The same description would apply to extracting opiates from unprocessed poppy seeds as described in the indictment.

The word *material* also is not defined in the CSA. So, again, we begin by looking at its ordinary meaning. The *Oxford English Dictionary* defines *material* as "[m]atter (not precisely characterized); that which constitutes the substance of a thing(physical or non-physical); a physical substance; a material thing" or "[t]he matter or substance from which a thing is or may be made." *Material, Oxford English Dictionary*, Oxford Univ. Press (online ed. 2026), https://doi.org/10.1093/OED/1020560189 [https://perma.cc/G65U-ELNB]; *see also Material*, *Black's Law Dictionary* (12th ed. 2024) ("[t]he things that are used for making or doing something" or "[a] solid substance such as wood, plastic, metal, or paper"). These are very broad definitions, which would certainly appear to encompass poppy seeds. And when we look to the use of the term in the CSA, we are confirmed in that application. *See United States v. Theis*, 853 F.3d 1178, 1181

9

(10th Cir. 2017) (in determining the meaning of a word in a statute, "we must . . . consider both the specific context in which the word is used and the broader context of the statute as a whole"). The word appears in the phrase "any . . . *material* which may be used to manufacture a controlled substance or listed chemical." 21 U.S.C. § 843(a)(6)–(7) (emphasis added). We can see no reason to exclude poppy seeds from the natural meaning of the word *material*.

Defendants do not seriously take issue with this plain meaning. But they invoke canons of interpretation to suggest a more limited meaning of the statutory term. We are not persuaded.

### 2.     In Pari Materia

*In pari materia* is Latin for "in the same matter." Antonin Scalia & Brian A. Garner, *Reading Law* 430 (2012). "It is a canon of construction that statutes *in pari materia* should be construed together, so that ambiguities in one statute may be resolved by looking at another statute on the same subject." *Id.*

Defendants argue that § 843(a)(6) and (7) should be interpreted in light of § 802(19) and (20), which define *opium poppy* as "the plant of the species Papaver somniferum L., except the seed thereof" and *poppy straw* as "all parts, except the seeds, of the opium poppy, after mowing." "Opium poppy" and "poppy straw" are listed as Schedule II substances in 21 C.F.R. § 1308.12(b)(3), so the statutory exception for poppy seeds precludes prosecution for the possession or distribution of poppy seeds as Schedule II substances. Defendants' argument appears to be that given the exclusion of poppy seeds from the controlled-substance schedule, it would

10

be contradictory, or at least irregular, to allow poppy seeds to be prosecuted as a precursor to a controlled substance.

But a great variety of substances that do not appear in the controlled-substance schedules can be prosecuted when they perform a role in manufacturing controlled substances. *See, e.g.*, *United States v. Walls*, 293 F.3d 959, 968 (6th Cir. 2002) (chemicals and equipment used to manufacture methamphetamine included Red Devil lye, propane torch, and coffee filter); *United States v. Venters*, 539 F.3d 801, 803 (7th Cir. 2008) (materials and equipment used to manufacture methamphetamine included lithium batteries, coffee filters, blender, and drain cleaner). Indeed, there would be little point in the CSA provisions prohibiting possessing and distributing precursors used to manufacture controlled substances if every precursor was already a controlled substance whose possession and distribution is prohibited.

To be sure, it *is* unusual for a potential precursor to be explicitly excluded from a controlled-substance schedule. But there is no mystery why the same substance would not appear on a schedule yet still be subject to prosecution as a precursor that can be used to manufacture a controlled substance. Recall that possession or distribution of a precursor is prohibited only if the possessor or distributor "know[s], intend[s], or [has] reasonable cause to believe[] that it will be used to manufacture a controlled substance." 21 U.S.C. § 843(a)(6)–(7). If a substance is not dangerous in general, there may be good reason not to prohibit its possession or distribution as a controlled substance while prohibiting its possession or distribution when the intent is to use it to manufacture a dangerous substance. We

11

said as much in *United States v. Truong*, which explained the CSA treatment of pseudoephedrine:

> Presumably because of the large-scale legitimate use of pseudoephedrine as a cold remedy, and a concern about not imposing unreasonable duties or risk of criminal liability on the pharmacies and convenience stores that sell this common product, Congress limited the reach of 21 U.S.C. §§ 841 and 843 to sellers with the actual knowledge or intent . . . that it would be used to manufacture methamphetamine.

425 F.3d 1282, 1291 (10th Cir. 2005).

The indictment here alleges similar circumstances for poppy seeds. It states that poppy seeds can be possessed and distributed in a useful, nondangerous manner. For example, suppliers can "process [imported unprocessed] poppy seeds to an edible food grade standard" and distribute them to retailers for resale "as a food product to individuals for consumption." Aplt. App. at 140. In contrast, Defendants allegedly possessed and distributed unprocessed poppy seeds for individuals to make poppy-seed tea and extract opiates, not, say, for bakeries to use for food products. And the government can secure a conviction only if it proves, beyond a reasonable doubt, that Defendants in fact knew or intended that the poppy seeds would be used to manufacture opioids. *See* 21 U.S.C. § 843(a)(6)–(7).

Defendants suggest that it makes no sense to permit prosecution of possession or distribution of poppy seeds when intended for use in poppy-seed tea, because the prohibited chemicals in the tea are on the poppy seeds to begin with. It argues that "if Congress thought that poppy seeds were dangerous enough in and of themselves to be regulated in some fashion, but did not want to impose Schedule II penalties, then it

12

could have listed them under a lower schedule," or "it could have narrowed its regulation in some other way, such as by including poppy seeds within the definition of the opium poppy plant unless the seeds have been washed." Aplees. Br. at 21–22. But then every importer of unprocessed poppy seeds who serves the bakery industry would be subject to regulation under the CSA. It seems to us eminently reasonable to limit regulation and prosecution to those who possess or distribute the unprocessed poppy seeds for their opioid qualities as opposed to their qualities for baking.

In short, there is good reason to treat poppy seeds as not being controlled substances while including them as prohibited precursors in the right circumstances. The statutory context (the exclusion of poppy seeds from controlled-substance schedules) does not imply otherwise. That is, the exclusion of poppy seeds from Schedule II of the CSA does not imply that poppy seeds are not a *material* for purposes of 21 U.S.C. § 843(a)(6)–(7).

### 3.    Noscitur a Sociis *and* Ejusdem Generis

The *noscitur a sociis* canon "instructs that when a statute contains a list, each word in that list presumptively has a 'similar' meaning." *Yates v. United States*, 574 U.S. 528, 549 (2015) (Alito, J., concurring). And under the *ejusdem generis* canon, "a general or collective term at the end of a list of specific items is typically controlled and defined by reference to the specific classes that precede it." *Fischer v. United States*, 603 U.S. 480, 487 (2024) (ellipsis and internal quotation marks omitted). For example, "if a statute is said to apply to 'tacks, staples, nails, brads, screws, and fasteners,' it is clear from the words with which they are associated that

13

the word *nails* does not denote fingernails and that *staples* does not mean reliable and customary food items." Scalia & Garner, *supra*, at 196. Defendants invoke these canons in support of their preferred interpretation of the CSA. We are not persuaded.

Section 843(a)(6)–(7) criminalizes the possession or distribution of "any three-neck round-bottom flask, tableting machine, encapsulating machine, or gelatin capsule, or any equipment, chemical, product, or material which may be used to manufacture a controlled substance or listed chemical, knowing, intending, or having reasonable cause to believe, that it will be used to manufacture a controlled substance." Defendants contend that the interpretation of a "material which may be used to manufacture a controlled substance" should be constrained by the references to "three-neck round-bottom flask, tableting machine, encapsulating machine, or gelatin capsule" and "equipment, chemical, product."

These related-meaning canons, however, apply only when terms are "conjoined in such a way as to indicate that they have some quality in common." Scalia & Garner, *supra*, at 196 (*noscitur a sociis* canon); *see id.* at 199 (a rationale for the *ejusdem generis* canon is that "[w]hen the initial terms all belong to an obvious and readily identifiable genus, one presumes that the speaker or writer has that category in mind for the entire passage"); *id.* at 209 (the *ejusdem generis* canon does not apply if "the specifics do not fit into any kind of definable category—the enumeration of the specific items is so heterogeneous as to disclose no common genus" (internal quotation marks omitted)).

14

Before applying the canons to the contested statutory language, we note some statutory history that clarifies our task. The original version of 21 U.S.C. § 843(a)(6) and (7) prohibited the possession and distribution of only "any three-neck round-bottom flask, tableting machine, encapsulating machine, gelatin capsule, or equipment specially designed or modified to manufacture a controlled substance, knowing that it will be used to manufacture a controlled substance." Anti-Drug Abuse Amendments Act of 1988, Pub. L. No. 100-690, tit. VI, sec. 6057, 102 Stat. 4181, 4319. But when the statute was amended in 1993, Congress removed the requirement that items be "specially designed or modified to manufacture a controlled substance" and replaced "gelatin capsule, or equipment" by "or gelatin capsule, or any equipment, chemical, product, or material." Domestic Chemical Diversion Control Act of 1993, Pub. L. No. 103-200, sec. 3(g)(1), 107 Stat. 2333, 2337–38. This revision shows that Congress had two groupings in mind: (1) the original specific items: "three-neck round-bottom flask, tableting machine, encapsulating machine, [and] gelatin capsule," followed by (2) four new broad catch-all terms: "equipment, chemical, product, or material."

The canons apply only if the specific items have a feature in common that should restrict our interpretation of the catch-all terms. For example, the term *chemical* would encompass only those chemicals that fit within a genus implied by the specific items listed. Defendants contend that "the list invokes items and substances used in deliberate production processes, not naturally occurring raw substances that already are controlled or that contain controlled substances in their

15

native state." Aplees. Br. at 25. We think that a bit of a stretch. None of the specific listed items are chemicals, nor could they be reliably interpreted to limit the term *chemical* in any definite way. To use the specific items listed as a means to define a genus that limits the types of chemicals encompassed by the statute (such as excluding "naturally occurring" chemicals) requires far too much imagination to be a reliable guide for interpreting the provision. And Defendants ignore the definition of *manufacture*, which includes "extraction from *substances of natural origin*," 21 U.S.C. § 802(15) (emphasis added), a not-so-subtle clue in the statute that a prosecutable precursor could be a naturally occurring substance.

Likewise, one could ask how the meaning of the final word *material* is limited by a common feature of the three preceding general words: *equipment*, *chemical*, and *product*. Again, picking a common feature applicable to the issue before us requires a creativity that goes beyond our comfort zone in construing statutes. Also, we should be particularly cautious in concocting a common feature since all four words are preceded by the modifier *any*, which is generally interpreted to apply broad meaning to subsequent nouns. *See Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 218–19 (2008) ("We have previously noted that read naturally, the word *any* has an expansive meaning, that is, one or some indiscriminately of whatever kind" (brackets and internal quotation marks omitted) (italics added)). We conclude that the two related-meaning canons do not restrict the CSA meaning of *material* to exclude poppy seeds.

16

### 4.    *Surplusage*

Defendants next contend that a broad reading of the phrase "any . . . material which may be used to manufacture a controlled substance" makes the other terms ("any three-neck round-bottom flask, tableting machine, encapsulating machine, or gelatin capsule, or any equipment, chemical, product") mere surplusage. Yes, we "presum[e] that statutory language is not superfluous." *McDonnell v. United States*, 579 U.S. 550, 569 (2016) (internal quotation marks omitted). But this is a presumption, not a rigid command. *See Stanley v. City of Sanford*, 606 U.S. 46, 56 (2025) ("[T]he canon against surplusage is not an absolute rule[,] [a]nd it certainly does not require us to favor an unusual meaning that will avoid surplusage over a more natural one" (brackets, citation, and internal quotation marks omitted)).

"Sometimes drafters *do* repeat themselves and *do* include words that add nothing of substance, either out of a flawed sense of style or to engage in the ill-conceived but lamentably common belt-and-suspenders approach." Scalia & Garner, *supra*, at 176**.** And we should not be too judgmental. What may seem ill-conceived to a gifted writer may be politically necessary for a legislator. Congress may, for example, "use[] broad, overlapping terms" to ensure that a subject is covered. *U.S. Postal Serv. v. Konan*, 146 S. Ct. 736, 746 (2026) (interpreting *miscarriage* and *loss* in postal-immunity provision in a potentially redundant manner, but explaining that Congress may have deployed the "overlapping terms to better keep complaints about mail delivery out of court"). It also "may on occasion repeat language in order to emphasize it." *Marx v. Gen. Revenue Corp.*, 668 F.3d 1174, 1183 (10th Cir. 2011)

17

("[I]f canons of construction are to be invoked, the appropriate one is that of *ex abundanti cautela* (abundance of caution)"), *aff'd on other grounds*, 568 U.S. 371 (2013). Indeed, in a survey of congressional committee counsel with drafting responsibility, almost 20% said that Congress may purposefully include surplusage "to ensure that the statute covers the intended terrain" or to satisfy "political interests" of representatives, constituents, and lobbyists who demand that certain words or phrases be included. Abbe R. Gluck & Lisa Schultz Bressman, *Statutory Interpretation from the Inside—An Empirical Study of Congressional Drafting, Delegation, and the Canons: Part I*, 65 Stan. L. Rev. 901, 934 (2013). The CSA itself illustrates the point. It defines *controlled substance* as "a drug or other substance," 21 U.S.C. § 802(6), although every drug is a substance.

In short, we see no reason to depart from the common meaning of the term *material*, or the terms *chemical* and *product*. The natural, and best, reading of the statute is that Congress amended the provision in 1993 to make it comprehensive, using several broad overlapping terms to cover any escape hatches for those engaged in producing controlled substances.

### 5.    *Lenity, Vagueness, and Constitutional Avoidance*

Finally, having concluded that the natural reading of § 843(a)(6) and (7) encompasses the conduct with which Defendants are charged, we can summarily dispose of their remaining arguments. Defendants invoke the rule of lenity and contend that their construction of the law must be adopted for it to be constitutional because otherwise it would be unconstitutionally vague. *See United States v. Davis*,

18

588 U.S. 445, 464 (2019) (the rule of lenity "teach[es] that ambiguities about the breadth of a criminal statute should be resolved in the defendant's favor"); *id.* at 463 n.6 (canon of constitutional avoidance requires courts, if possible, to "interpret ambiguous statutes to avoid rendering them unconstitutional"). As acknowledged by Defendants, however, these arguments fail if the statute is not ambiguous. We reject these arguments because we see no ambiguity in the statute as applied in this case.

Similarly, Defendants argue that the statute is unconstitutionally vague. *See United States v. Lesh*, 107 F.4th 1239, 1247 (10th Cir. 2024) (stating that a law may be unconstitutionally vague "if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "if it authorizes or even encourages arbitrary and discriminatory enforcement" (internal quotation marks omitted)). In particular, (1) they claim that under the government's broad interpretation of the CSA, the statute could "extend to anything at all (*e.g.*, a syringe or a spoon) that could be used, in even a minor way, to make it easier for a drug user to consume a controlled substance," Aplees. Br. at 38; (2) they say that the statute provides no textual ground to distinguish between processed and unprocessed poppy seeds, "nor any reasonably identifiable line for how much opium latex is acceptable to have on poppy seeds under the CSA," *id.* (internal quotation marks omitted); and (3) they claim that the statute as interpreted by the government would be "affirmatively misleading" because of the specific exemption of poppy seeds from Schedule II, *id.* at 37.

But we are not concerned with whether the law may be vague as "applie[d] to *other* defendants in *other* cases"; a defendant "may complain *only* about the vagueness of the law as it applies *in his own case*." *United States v. Baldwin*, 745 F.3d 1027, 1031 (10th Cir. 2014) (Gorsuch, J.). Defendants' indictment was not based on a notion of manufacturing that included use of a spoon or syringe, and we established above that the manufacturing alleged in this case clearly satisfied the statutory definition. Nor is there any need to worry about where to draw the line on how much opium latex was on the seeds that Defendants possessed and distributed; the indictment alleges that there was enough latex to produce controlled substances. And we are not inclined to recognize a doctrine excusing criminal conduct by supposing that a perpetrator was misled by reading only a "helpful" (although cabined) portion of a statute (the CSA provision excluding poppy seeds from Schedule II), while ignoring the portion (§ 843(a)(6) and (7)) that the perpetrator violated.

### B.    Count 20

Count 20 of the indictment charges a money-laundering conspiracy under 18 U.S.C. § 1956(h). The parties disagree about whether that count should be reinstated if we reinstate the precursor counts. The district court should resolve this issue on remand.

## III.    CONCLUSION

We **REVERSE** in part the district court's dismissal of the superseding indictment and **REMAND** to the district court for further proceedings consistent with this opinion.