FILED
United States Court of Appeals
Tenth Circuit

February 18, 2014

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

CHARLES A. BALDWIN,

Defendant-Appellant.

No. 13-1198

---

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:11-CR-00018-PAB-1)**

---

**Submitted on the briefs[*]:**

Charles A. Baldwin, pro se.

J. Bishop Grewell, Assistant United States Attorney, and John F. Walsh, United States Attorney, District of Colorado, Denver, Colorado, for Plaintiff-Appellee.

---

Before **GORSUCH**, **ANDERSON**, and **HOLMES**, Circuit Judges.

---

**GORSUCH**, Circuit Judge.

---

[*] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

Deep in the Code of Federal Regulations, in the part titled "Public Contracts and Property Management," lie two small provisions that would be easy to overlook were it not for disputes like this one. The first says "[p]ersons in and on [Federal] property must at all times comply . . . with the lawful direction of Federal police officers and other authorized individuals." 41 C.F.R. § 102-74.385. The second adds "[a]ll persons entering in or on Federal property are prohibited from loitering, exhibiting disorderly conduct or exhibiting other conduct on property that . . . impedes or disrupts the performance of official duties by Government employees." *Id.* § 102-74.390. After trial, Charles Baldwin found himself criminally convicted for violating both. An attorney for the Department of Interior, he now appeals his convictions acting as his own lawyer. Among other things, he argues that violating these two federal regulations isn't a crime — and that even if it is a crime he didn't act with sufficient *mens rea* to be held criminally culpable. Mr. Baldwin's points are not without some power. But in light of the circumstances we face in this case we find ourselves compelled to affirm all the same.

\*

The trouble began when Mr. Baldwin drove out of the Denver Federal Center at his workday's end. While still on the Federal Center grounds, Commander Kevin Lundy of the Federal Protective Service stopped Mr. Baldwin's truck. Commander Lundy did this because he'd seen Mr. Baldwin

speeding and swerving to avoid a bicyclist, and he wanted to issue a warning. But before Commander Lundy could finish the warning Mr. Baldwin drove off, ignoring shouted commands to stop. In response, Commander Lundy took to his police car and followed Mr. Baldwin off the Federal Center's grounds, stopped him again, and asked for his driver's license, registration, and proof of insurance. According to Commander Lundy, Mr. Baldwin refused to comply and had to be forced from his vehicle and restrained with handcuffs. At the end of it all, Commander Lundy issued various tickets and allowed Mr. Baldwin to go on his way.

After a bench trial before a federal magistrate judge, the court convicted Mr. Baldwin of three offenses. Two of these offenses — failing to comply with "the lawful direction of [a] Federal police officer[]" and "imped[ing] or disrupt[ing]" the performance of a government employee's official duties — were premised on federal regulations 41 C.F.R. § 102-74.385 and 41 C.F.R. § 102-74.390(c). The third — attempting to obstruct a peace officer — was based on Colorado state law and the Assimilative Crimes Act. *See* 18 U.S.C. § 13; Colo. Rev. Stat. §§ 18-8-104(1)(a); 18-2-101(1); *United States v. Christie*, 717 F.3d 1156, 1170 (10th Cir. 2013).

\*

In challenging his convictions under the federal regulations, Mr. Baldwin begins by disputing the idea the regulations purport to articulate crimes at all.

- 3 -

Looking at the regulations, he points out that their section headings pose these questions: "What is the policy concerning conformity with official signs and directions?" and "What is the policy concerning disturbances?" 41 C.F.R. §§ 102-74.385, 102-74.390. The regulations themselves then proceed to answer the questions their titles pose. In light of this, Mr. Baldwin submits, the regulations can be sensibly understood as articulating no more than administrative rules or policies, not crimes.

The regulations certainly do delineate policy, but that isn't all they do. Another section of the same regulatory "subpart" expressly provides that the very sections Mr. Baldwin violated *can* be enforced through *criminal* sanctions: "A person found guilty of violating any rule or regulation in this subpart . . . shall be . . . imprisoned for not more than 30 days," subject to fines as prescribed by "title 18 of the United States Code," or both. *Id.* § 102-74.450. Title 18, in turn, indicates that fines for crimes with a maximum term of imprisonment of 30 days are usually limited to no more than $5,000. *See* 18 U.S.C. §§ 3559(a)(8), 3571(b)(6).

By what authority is the Executive permitted to criminalize conduct and impose jail terms in administrative regulations buried deep within the Code of Federal Regulations? Normally we don't think of regulatory agencies as entitled to announce new crimes by fiat. But with some scratching around we see that Congress did expressly authorize first the General Services Administration and

- 4 -

then the Department of Homeland Security to establish regulations "for the protection and administration of property owned or occupied by the Federal Government" and to prescribe "reasonable" penalties of "not more than 30 days" in prison and fines in the amounts allowed by title 18. *See* 40 U.S.C. § 1315(c) (formerly found at 40 U.S.C. §§ 318a, 318c); *cf.* 6 U.S.C. § 552 (facilitating transfer of authority from GSA to DHS). So it is that the regulation at issue before us can claim at least some legislative pedigree, some measure of congressional authorization.

Still there's no question the arrangement bears its curiosities. Can Congress so freely delegate the core legislative business of writing criminal offenses to unelected property managers at GSA? Might this arrangement, though arrived at with Congress's assent, still blur the line between the Legislative and Executive functions assigned to separate departments by our Constitution? *Cf. Touby v. United States*, 500 U.S. 160, 165-66 (1991) (admitting "[o]ur cases are not entirely clear as to whether more specific guidance is in fact required" when Congress is delegating authority "to promulgate regulations that contemplate criminal sanctions"); Wayne R. LaFave, *Criminal Law* § 2.6(a), at 131 & nn.6-7 (5th ed. 2010). Thanks to this and many other similar and similarly generous congressional delegations, the Code of Federal Regulations today finds itself crowded with so many "crimes" that scholars actually debate their number. *See, e.g.*, John C. Coffee, Jr., *Does "Unlawful" Mean "Criminal"?: Reflections on*

*the Disappearing Tort/Crime Distinction in American Law*, 71 B.U. L. Rev. 193, 216 (1991) ("By one estimate, there are over 300,000 federal regulations that may be enforced criminally."); Susan R. Klein & Ingrid B. Grobey, *Debunking Claims of Over-Federalization of Criminal Law*, 62 Emory L.J. 1, 28 (2012) ("An enormous number of new regulatory crimes were enacted in the period 1980-2011, so many that we were unable to count even a fraction of them . . . ."). And quite apart from the separation of powers questions these arrangements pose, what about the "reasonableness" limitation found in the specific delegation before us?  In the statute at issue here, Congress says agency officials may prescribe only "reasonable" criminal penalties within the limits it has prescribed (30 days in prison, usually no more than $5,000 in fines).  Who's to say what in that range is reasonable, and by what measure?

In the end, these curiosities turn out to be no more than side shows in our case.  Mr. Baldwin doesn't argue that the arrangement before us represents a constitutionally excessive delegation of legislative authority.  He doesn't argue that the regulations or the penalties they impose are themselves "unreasonable" or otherwise invalid.  So it is that in this case all these questions float by the board, left for others to encounter and resolve in the future.  In this appeal, Mr. Baldwin

begins by challenging *only* whether the regulations themselves purport to impose criminal penalties. As we've seen, at least *that* much they clearly do.

*

Even if the regulations before us do purport to impose criminal penalties, Mr. Baldwin does suggest that their terms are so vague they must violate the Constitution's due process guarantee. In one sense, Mr. Baldwin touches on an important point here too. Criminal offenses must be defined "with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *United States v. Orona*, 724 F.3d 1297, 1310 (10th Cir. 2013). And some of the questions he raises are not without their worries. If, on the one hand, it's a crime for anyone on federal property to "impede or disrupt" a government employee's "performance of official duties," what public servant among us couldn't be brought up on charges on a prosecutorial whim? Pressing a prosaic conversation with a co-worker about ski conditions in the high country might seem enough to make criminals of us all. If, on the other hand, the regulations don't proscribe so much, then what exactly do they proscribe?

But whatever the answers to these questions, at the end of the day Mr. Baldwin doesn't help his own cause by asking them. He doesn't because, under governing precedent, a defendant won't be heard to complain about the vagueness of a criminal law as it applies to *other* defendants in *other* cases. He

may complain *only* about the vagueness of the law as it applies in *his own case*. The Supreme Court has told us (repeatedly) that the relevant question in void for vagueness challenges is merely whether the defendant before us "had fair notice from the language" of the law "that the particular conduct which he engaged in was punishable." *Parker v. Levy*, 417 U.S. 733, 755 (1974); *see also United States v. Franklin-El*, 554 F.3d 903, 910-11 (10th Cir. 2009). And it's clear enough from the terms of regulations before us that, whatever else they do or don't proscribe, driving off while a uniformed officer is busy issuing a warning, and doing so over the officer's instructions to stop, counts as disobeying that person's directions and disrupting performance of his official duties. Maybe the regulations before us could be successfully challenged as impermissibly vague as applied in other situations, but under the law as it stands today we fail to see how they might be in this one.

*

Retreating, Mr. Baldwin says the criminal enforcement of the regulations before us violates the Constitution's due process guarantee in a separate and distinct way because the regulations themselves lack any *mens rea* requirement. Neither 41 C.F.R. § 102-74.385 nor 41 C.F.R. § 102-74.390 makes any mention of a required mental element to complete the offenses they describe. For all it appears, he says, they suggest strict liability. Yet, as Mr. Baldwin argues, strict liability crimes are generally thought to be — and should be — exceptional in our

legal system. And with at least that much, we entirely agree. As Justice Jackson explained:

> The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil. A relation between some mental element and punishment for a harmful act is almost as instinctive as the child's familiar exculpatory "But I didn't mean to," and has afforded the rational basis for a tardy and unfinished substitution of deterrence and reformation in place of retaliation and vengeance as the motivation for public prosecution.

*Morissette v. United States*, 342 U.S. 246, 250-51 (1952) (footnotes omitted); *see also Staples v. United States*, 511 U.S. 600, 605 (1994); *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 436-38 (1978).

The difficulty is, a law's silence about *mens rea* doesn't necessarily mean violating it isn't a crime, as Mr. Baldwin would have us conclude. In fact, a law's silence on the question of *mens rea* doesn't even mean the law lacks a *mens rea* requirement. To the contrary, as Justice Jackson proceeded to explain in *Morissette*, the courts of the United States have long said they will read criminal statutes as implicitly requiring proof of *mens rea* even when they don't require such proof explicitly. *See Morissette*, 342 U.S. at 263; *see also Staples*, 511 U.S. at 605-06; *U.S. Gypsum*, 438 U.S. at 437. We have defended this practice on at least two grounds — first, the presumption that Congress generally wishes us to interpret its laws in light of the long common law tradition linking criminal

punishment and *mens rea*, a presumption Congress is well on notice of; second, the general injunction that ambiguity about the scope of criminal statutes should be resolved in favor of lenity. *See, e.g.*, *U.S. Gypsum*, 438 U.S. at 437. For these reasons, the trial court in this case expressly required the government to prove that Mr. Baldwin *knowingly* failed to comply with the lawful direction of a federal police officer and *knowingly* impeded and disrupted the performance of a government employee's official duties. Neither does Mr. Baldwin suggest to us that some other *mens rea* requirement than this was required or more appropriate. *See United States v. Brice*, 926 F.2d 925, 928 & n.4 (9th Cir. 1991) (similarly reading a *mens rea* requirement into these regulations' predecessors).

Instead and shifting gears once again, Mr. Baldwin claims there wasn't enough evidence presented at trial to support the court's finding that he acted with the knowledge he was charged with. Mr. Baldwin insists and insisted at trial he didn't hear Commander Lundy's orders to stop because he suffers from hearing trouble. The trial court considered that testimony, however, and found otherwise. In support of its finding, it pointed out that Commander Lundy said he was shouting. It noted that another federal officer, farther away from Commander Lundy than Mr. Baldwin, testified *he* could clearly hear Commander Lundy's shouts. The court emphasized, as well, that video footage seemed to show Mr. Baldwin responding to the shout by speeding away, as if in an attempt to flee. In light of this evidence, the court rejected Mr. Baldwin's account and found as a

- 10 -

matter of fact that he *did* hear Commander Lundy's call to stop. As a court of appeals, we may overturn a trial court's factual finding only if it is clearly wrong — "the error must be pellucid to any objective observer." *Watson v. United States*, 485 F.3d 1100, 1108 (10th Cir. 2007). Given the conflicting accounts before us, and the considerable evidence weighing in favor of the court's factual finding, we are in no position to say the trial court here fell afoul that low threshold.

Likewise, we see no way to accept Mr. Baldwin's contention that, even if he did hear and ignore Commander Lundy's command, there was insufficient evidence presented at trial that any regulatory violation took place on federal property — as opposed to later, after he left the Federal Center and Commander Lundy stopped him a second time. Mr. Baldwin admits his initial stop on the Federal Center grounds was lawful. The evidence shows that Mr. Baldwin drove away while Commander Lundy was in the middle of issuing his warning and that Mr. Baldwin disregarded the order to halt. To finish issuing the warning, Commander Lundy had to leave his post and follow Mr. Baldwin away from the Federal Center. From all this, and even without considering the more contentious interaction between Mr. Baldwin and Commander Lundy off federal grounds, the evidence surrounding the initial stop easily supports the conclusion that Mr. Baldwin knew his conduct amounted to a disregard of a police officer's lawful order and disrupted or impeded the officer's duty on federal grounds.

Mr. Baldwin replies that, in truth, Commander Lundy wasn't a "police officer" or attempting to perform his "official duties" within the meaning of federal law. But he points us to no federal statute or regulation suggesting otherwise, only the facts in this case. And viewing those facts in the light most favorable to the government, as we must given that it prevailed at trial, we cannot agree with Mr. Baldwin here either. Commander Lundy's testimony and his "POLICE" uniform suggest that much, and his position description tends to confirm the point: among his official duties are preserving the peace, preventing crime, and arresting offenders.

*

Neither can Mr. Baldwin himself get far by faulting the government for failing to prove that it had posted physical notice of the two federal regulations in question at the Denver Federal Center. He is surely right that the statute authorizing criminal enforcement of the regulations also requires those regulations to "be posted and remain posted in a conspicuous place on the property." 40 U.S.C. § 1315(c)(1); *see also* 41 C.F.R. § 102-74.365. He is surely right, too, that fair notice of the law's demands is no small thing in a society striving to live under the law's rule. But Mr. Baldwin doesn't contend he lacked *actual* notice of the substance of the regulations. He doesn't dispute that he *knew* he shouldn't disregard orders from officers or speed off in the middle of an investigative detention. Instead, he complains only that the government failed to

- 12 -

prove that it *posted* a notice. And the problem with this rather formal argument is itself pretty formal: Mr. Baldwin never raised it at trial. So it is the government never had notice that the question of a posted notice was in play. Mr. Baldwin doesn't identify any reason for neglecting to raise the argument until this appeal, but insists that he should prevail on it all the same. In these circumstances — when an argument was fully available to a litigant at trial but he simply neglected to raise it until appeal — we normally treat the matter as forfeited. *See Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1128 (10th Cir. 2011).

Of course, we may still take notice of a forfeited error and reverse if it qualifies as "plain error." *See id.*; Fed. R. Crim. P. 52(b). But to prevail on a claim of plain error, an appellant must not only point us to an error, he must also show that the error is plain or pellucid, that it affects his substantial rights, and that it seriously implicates the fairness, integrity, or public reputation of judicial proceedings. *Richison*, 634 F.3d at 1128.

It's the second step where we begin to stumble in this case. Neither this court nor the Supreme Court has decided whether posting the notice required by 40 U.S.C. § 1315(c)(1) and 41 C.F.R. § 102-74.365 is an element of the regulatory offenses at issue, which the government would have the obligation of proving, or something else altogether. As a textual matter, nothing in the statutory or regulatory provisions seems to say that failing to comply with a police officer's lawful order or disrupting performance of a government

- 13 -

employee's duties is criminally unlawful only if notice is posted. The two regulations under which Mr. Baldwin was charged make no mention of posted notices. And the posting requirement appears in distinct and separate provisions all its own. In these circumstances, we can hardly charge the trial court with *plainly* erring when it failed to impose on the government the burden to prove a *posted* (as opposed to actual) notice in this case. After all, had the issue been fairly presented and fully developed at trial, it is at least possible it could have turned out to be that the posting requirement is divorced from, not a prerequisite to, prosecution.

To be sure, some circuits have treated proof of posted (or actual) notice as a required element of regulatory crimes like the ones found in this case. *See, e.g.*, *United States v. Strakoff*, 719 F.2d 1307, 1309 (5th Cir. 1983) (interpreting 40 U.S.C. § 1315(c)(1)'s differently worded predecessor). But other circuits have refused to read the posting requirement as a prerequisite to prosecution and indeed found it irrelevant to any prosecution. *See, e.g.*, *United States v. Strong*, 724 F.3d 51, 57-58 (1st Cir. 2013) (interpreting 41 C.F.R. § 102-74.365); *United States v. Irby*, 269 F. App'x 246, 248-49 (4th Cir. 2008) (per curiam) (interpreting analogous provisions for property managed by the Department of Veterans Affairs). Without deciding which side has the better of this debate, its existence tends to confirm that the trial court in this case wasn't *plainly* wrong in failing to

impose on the government the burden of proving a posted notice, as Mr. Baldwin now contends.

*

Finally, Mr. Baldwin challenges the sufficiency of the evidence supporting his third conviction, under Colorado law and the Assimilative Crimes Act. Here, Mr. Baldwin was accused of knowingly using "an obstacle" in a "substantial step toward" obstructing or hindering "the preservation of the peace by a peace officer, acting under color of his or her official authority," while on federal property. *See* 18 U.S.C. § 13; Colo. Rev. Stat. §§ 18-2-101(1); 18-8-104(1)(a). The evidence was sufficient to show all this beyond a reasonable doubt, too. Rather than listen to a warning about how his speeding had endangered others — a warning Commander Lundy tried to issue under color of official authority in order to preserve the peace — Mr. Baldwin sought to use his vehicle (as an "obstacle") to get away (to "obstruct" Commander Lundy's inquiry). And whatever his status under federal law, Commander Lundy, along with his fellow Federal Protective Service officers, is clearly and expressly treated as a "peace officer" for purposes of Colorado law. *See* Colo. Rev. Stat. § 16-2.5-147(1). Neither is there any evidence that Mr. Baldwin ever abandoned this attempt to hinder Commander Lundy's cautionary efforts. *Cf. id.* § 18-2-101(3) (describing affirmative defense of abandonment). On the contrary, his attempt succeeded, at

- 15 -

least momentarily, as Commander Lundy had to chase Mr. Baldwin to finish the warning he had started.

The judgment is affirmed.