FILED
United States Court of Appeals
Tenth Circuit

June 18, 2014

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellant,

v.

No. 13-1474

CHESTON JEROME FOSTER,

Defendant - Appellee.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 1:13-CR-00062-CMA-1)**

---

William A. Glaser, Attorney, Appellate Section, Criminal Division, United States Department of Justice, Washington, D.C. (John F. Walsh, United States Attorney; Robert M. Russel, Chief, Appellate Section, Office of United States Attorney, District of Colorado, with him on the briefs; Mythili Raman, Acting Assistant Attorney General and Denis M. McInerney, Deputy Assistant Attorney General, with him on the opening brief; David A. O'Neil, Acting Assistant Attorney General and David M. Bitkower, Deputy Assistant Attorney General, with him on the reply brief), for Plaintiff-Appellant.

Madeline S. Cohen, Assistant Federal Public Defender (Virginia L. Grady, Interim Federal Public Defender, with her on the brief), Denver, Colorado, for Defendant-Appellee.

---

Before **BRISCOE,** Chief Judge, **MURPHY** and **MATHESON**, Circuit Judges.

---

**BRISCOE**, Chief Judge.

The sole issue in this case is whether Cheston Jerome Foster escaped from custody when he left a residential reentry center where he was ordered to reside as a condition of his supervised release. Foster was subsequently charged with one count of escape from custody, in violation of 18 U.S.C. § 751(a). The district court dismissed the indictment after concluding that Foster was not in custody. The government appeals. We exercise jurisdiction under 18 U.S.C. § 3731 and reverse and remand.

**I. BACKGROUND**

In 2012, Foster was arrested for violating the terms of his supervised release, including traveling to Massachusetts without permission. Following a revocation hearing on October 30, 2012, where Foster admitted the violations enumerated, the district court revoked his supervised release and sentenced Foster to time served and 30 months of supervised release. The probation officer asked the district court to add "an additional condition of supervision that may be relevant." App'x at 142. The probation officer stated:

> I am not sure what his residential circumstances are. He is presently in custody. He has spoken – he has talked about a desire to go to a different district. His employment is not sure at this point, so I would recommend the Court impose a six-month halfway house placement so that we could rectify the stability issue. You know, he could be let out of the halfway house early when the stability is in place.

Id. The court agreed and told Foster, "I will impose a special condition that you reside in a halfway house residential re-entry center, however you want to word it, for a period of up to six months." Id. Foster's attorney sought an alternative arrangement by providing

2

the probation office with the address of Foster's mother, but the probation officer opposed this suggestion. The district court stated, "[w]hat we will do is we will start with a residential re-entry center, and if through his assigned probation officer there is an alternative that is reasonable, we will go at it that way, but we will start there." Id. at 143. The court issued a written judgment on November 6, 2012, that included the conditions of Foster's new term of supervised release. It listed as an "additional condition[] of supervision," that "[t]he defendant shall reside in a resident [sic] reentry center (RRC) for a period of up to 6 months, to commence upon release of imprisonment, and shall observe the rules of that facility." Id. at 32.

On December 27, 2012, Foster left the residential reentry center without permission and did not return. On February 12, 2013, a grand jury issued an indictment charging Foster with a single count of escape from custody, in violation of 18 U.S.C. § 751(a).[1] Foster's attorney moved to dismiss the indictment because the residence requirement "was not part of any detention or a sanction for his supervised release violation," and therefore Foster was not in custody for purposes of the escape statute. Id. at 44.

---

[1] The indictment charged that on December 27, 2012, Foster "intentionally and unlawfully escaped from custody at the Independence House South," where "the defendant was lawfully confined at the direction of United States District Senior Judge Lewis T. Babcock for violation of supervised release by an order dated October 30, 2012." App'x at 38-39. The indictment also stated Foster was confined there "by virtue of a judgment and commitment by a United States District Court following the defendant's conviction for a felony offense." Id.

The district court granted Foster's motion to dismiss.[2]  The district court stated that "to endorse the government's reasoning turns a remedy used by Judge Babcock to provide a homeless man a stable place to live upon his release from custody into a means to return him to prison with a second felony conviction, one which carries with it a statutory penalty of up to five more years of incarceration." Id. at 83.  The district court highlighted "three distinct issues related to" the use of the term custody in § 751(a): "(1) the extent and scope of restraints on liberty necessary to constitute 'custody' for purposes of § 751(a); (2) whether someone other than the Attorney General (or his representative) can be a 'custodian' of a person charged with escaping custody; and (3) whether the underlying purpose of a restraint on liberty is custodial." Id. at 85.  The court noted that the third issue was "unresolved in this circuit" but had been decided by the Ninth Circuit in United States v. Burke, 694 F.3d 1062 (9th Cir. 2012). Id.  The district court held that "the Burke court's reasoning is not contrary to Tenth Circuit precedent and informs this Court's conclusion that a stop-gap measure used to prevent homelessness for a recently-released prisoner on supervised release does not constitute a custodial sentence triggering criminal liability under § 751(a)." Id.  After reviewing relevant Ninth and Tenth Circuit cases, the district court decided that "what constitutes 'custody' under § 751(a) is **not** the level of restraint; rather, it is the underlying purpose of that restraint." Id. at 91 (emphasis

---

[2] District Court Judge Lewis Babcock, who had presided over the revocation of Foster's supervised release, recused himself from hearing the criminal case charging a violation of 18 U.S.C. § 751(a).  See Supp. App'x.

4

in original).  The district court based this conclusion on the history of the Federal Escape Act, the purpose of supervised release, and the goals of the Sentencing Reform Act.  Id. at 91-98.

The district court also found it persuasive that "Judge Babcock could have both revoked the term of supervised release and imposed a new custodial sentence beyond what Mr. Foster had already served."  Id. at 99.  Had he done so, "and, if Mr. Foster had unlawfully absented himself from this confinement, then Mr. Foster could have been prosecuted under § 751(a)."  Id.  Instead, "Judge Babcock deemed that a custodial sentence of 'time served' was sufficient and that Mr. Foster should begin his term of supervised release, albeit with an initial transitory period in a halfway house."  Id. Although this placed restrictions on Mr. Foster's liberty, the district court found that "this term was 'by no means, by letter or in spirit, a custodial order of the Court.'"  Id. (quoting Burke, 694 F.3d at 1063).

## II. ANALYSIS

The government argues that Foster was in "custody" when housed at the residential reentry center pursuant to the district court's order, and that the district court erred in dismissing the indictment charging him with escape under 18 U.S.C. § 751(a). We review de novo the legal interpretation of "custody" as set forth in § 751(a).  United States v. Ko, 739 F.3d 558, 560 (10th Cir. 2014).  The federal escape statute, 18 U.S.C. § 751(a), states:

**Whoever escapes or attempts to escape** from the custody of

5

> the Attorney General or his authorized representative, or from any institution or facility in which he is confined by direction of the Attorney General, or **from any custody under or by virtue of any process issued under the laws of the United States by any court, judge, or magistrate judge**, or from the custody of an officer or employee of the United States pursuant to lawful arrest, shall, if the custody or confinement is by virtue of an arrest on a charge of felony, or conviction of any offense, be fined under this title or imprisoned not more than five years . . . .

18 U.S.C. § 751(a) (emphasis added).

The government argues that Foster escaped from custody when he left the reentry center. The government points out that custody under § 751(a) does not have to be physical but may be minimal or constructive, and because the statute applies to "any custody," it is not restricted to only punitive custody, or any other limitation of the term. The government therefore argues that "the plain meaning of the word indicates that a person is in custody under the escape statute if another person has the legal right to control his actions or limit his freedom." Appellant's Br. at 11. The government also contends the district court's reliance on "the 'underlying purpose' of the restraint [to] determine[] whether a person is in custody" is misplaced. Id. at 22 (quoting App'x at 91). The government contends that the district court misread Burke because the Ninth Circuit did not rely on the purpose of the restraint but instead rested its ruling on the extent of the restraint imposed upon Burke as a resident of the halfway house.

We agree with the government's interpretation of § 751(a), which is supported by our prior precedent. As regards the extent and scope of restraint necessary to constitute

6

custody under § 751(a), we stated in Depew v. United States: "'Custody,' as used in the escape statute, does not require direct physical restraint. Custody may be minimal and, indeed, may be constructive." 977 F.2d 1412, 1414 (10th Cir. 1992) (internal citations omitted). Although Depew dealt with the separate issue of whether the defendant was in federal or state custody when he was being transferred to county jail pursuant to a writ of habeas corpus ad prosequendum, we have previously emphasized that Depew's "holding" includes the statement that "custody may be minimal or even constructive." United States v. Sack, 379 F.3d 1177, 1181 (10th Cir. 2004); see also Ko, 739 F.3d at 562 n.1 ("Mr. Ko characterizes these statements [regarding minimal and constructive custody] from Depew as dicta, yet in Sack we repeatedly referred to these statements as 'our holding' from Depew.").

In Sack, we determined that escape charges are not limited to defendants who were previously in the custody of the Attorney General — a court-ordered placement in a halfway house, if violated, can also result in an escape charge. The district court had ordered Courtney Sack to reside at a halfway house as a condition of his pretrial release. Sack, 379 F.3d at 1178. When he left the halfway house without permission, he was charged with escape under § 751(a). Sack argued he did not violate § 751(a) because he was not in the custody of the Attorney General. Before resolving this question, we first discussed prior cases that addressed custody in the context of placement at a halfway house. Id. at 1179. One of these cases was United States v. Swanson, 253 F.3d 1220, 1223-24 (10th Cir. 2001), where we held that court-ordered residence at a halfway house

7

constituted "custody" under U.S.S.G. § 3C1.1, Note 4(e). In a footnote in Sack, we acknowledged that although Swanson did not interpret § 751(a), "it deserves mention that Swanson was not concerned with the identity of the custodian, but whether the nature of residence at a halfway house was sufficiently restrictive to constitute custody." Id. at 1179 n.1. We then stated that Depew's holding "that custody may be minimal or constructive[] suggests that the restrictions of life at a halfway house are sufficiently limiting so as to constitute custody for the purposes of § 751." Id. In the main text of the opinion, we stated: "Because Sack was in the custody of the halfway house as a result of an order of the district court, we conclude he was in custody under § 751." Id. at 1179.

Ko provides further support for our conclusion that "real physical confinement" is not a necessary predicate for escape. Ko involved a defendant who was transferred by the Bureau of Prisons ("BOP") to his home to complete the remaining few months of his sentence. 739 F.3d at 559. Although Ko was allowed to leave his home for work, he was also required to return every evening. Id. When his electronic monitoring bracelet indicated he had not returned home as required and he could not be located, Ko was charged with escape under § 751(a). Id. at 559-60. Ko moved to dismiss the indictment, arguing he was not in custody, and the district court granted the motion. Id. at 560. On appeal, Ko argued that custody under § 751 required "'real physical confinement' that does not suggest 'leaving one's own home.'" Id. We rejected this argument, stating that "'custody' does not necessarily require an element of physical restraint" but instead "anyone under 'immediate charge and control . . . exercised by a person or an authority'

8

may be said to be in 'custody.'" Id.

In Ko, after concluding that the rule of lenity did not apply, we discussed Sack and Depew:

> In Sack . . . [w]e concluded that, although a halfway house entails fewer restrictions than prison, "the restrictions of life at a halfway house are sufficiently limiting so as to constitute custody for the purposes of § 751." Sack, 379 F.3d at 1179 n.1. In so holding, this court referenced only one restriction–the inability "to come and go at will." Id. (quoting United States v. Swanson, 253 F.3d 1220, 1224 (10th Cir. 2001)). Likewise, this court in United States v. Depew, concluded that a federal prisoner, who was in transit between two state facilities on a writ of habeas corpus ad prosequendum, was in § 751 custody. 977 F.2d 1412, 1414 (10th Cir. 1992). We held that § 751 custody "does not require direct physical restraint." Id. In fact, § 751 custody "may be minimal and, indeed, may be constructive." Id.

Id. at 561-62. We then analogized home confinement to residence in a halfway house:

> Home confinement is analogous to custody in a halfway house. Like a prisoner in a halfway house, Mr. Ko was not free to come and go as he pleased–his confinement required him to remain in his home from 7:00 p.m. each night until he was permitted to go to work the following morning. . . . Mr. Ko argues that by "[b]eing allowed to live in the comfort of [his] own home and to be away for work or other approved activities," he was not subject to a "quantum of restraint" necessary for "custody." However comfortable Mr. Ko may have found the arrangement, the BOP did not intend it to be anything less than an extension of his imprisonment. In Mr. Ko's case, imprisonment entailed constant monitoring, a monitoring bracelet, and spatial and temporal bounds. In that way, the restrictions on his life in home confinement were sufficiently limiting so as to constitute custody under § 751.

Id. at 562 (citations omitted). Given our prior precedent in Depew, Sack, Swanson, and

9

Ko, we easily conclude that court-ordered residence at a halfway house is sufficiently restrictive to constitute custody.

We also reject Foster's reliance on Burke as authority for our considering a sentencing court's underlying purpose for halfway house placement when determining whether an individual is in "custody" under § 751(a). Both Foster and the district court misread Burke. Burke does not stand for the proposition courts are to look to the underlying purpose of the restraint when determining whether an individual is in "custody" under § 751(a). In Burke, the Ninth Circuit focused only on whether Burke's freedom was sufficiently restricted to constitute custody, looking to the fact that "the conditions of his release 'were much more analogous to probation than they were to imprisonment.'" 694 F.3d at 1064 (quoting Baxley, 982 F.2d at 1269). There is no indication that the Ninth Circuit found the district court's intent to help Burke was at all relevant.

However, none of our prior cases have had occasion to consider whether the level of restriction alone determines whether a defendant is in custody, or whether we must also consider the purpose behind the sentencing court's placement. Foster provides two arguments for why the purpose of confinement is relevant when determining whether a defendant is in custody. First, he argues that court orders that address the placement of a defendant are not inherently custodial, and without a limiting principle, the meaning of "custody" within § 751(a) would be unconstitutionally vague. Second, Foster argues that the meaning of "custody" is ambiguous and thus the rule of lenity should apply. Because

10

the district court here found the placement in the halfway house was not intended to be custodial, but instead was "a stop-gap measure used to prevent homelessness," Foster argues that notwithstanding that his placement in the reentry center was a condition of his release, he was not in custody. Appellee's Br. at 17-18 (quoting App'x at 85).[3]

Foster's first argument is that interpreting "custody" to include all instances of court-ordered residential placement during supervised release would render the statute unconstitutionally vague. He prefaces this argument with his contention that unlike the other categories of custody in § 751(a), court orders do not create inherently custodial relationships. Foster argues the Attorney General can "control a person's residence only

_____

[3] Curiously, Foster does not raise many of the theories the district court found persuasive, such as the history of the Federal Escape Act, the purpose of supervised release, and the purposes of the Sentencing Reform Act, to conclude that supervised release can never constitute "custody" under § 751(a). The district court's reasoning ignores, however, the plain language of § 751(a), which evinces a broad scope. See 18 U.S.C. § 751(a) ("*any* custody . . . by virtue of *any* process . . . by *any* court" (emphasis added)). Limiting court-ordered custody to exclude defendants on supervised release does not support this legislative intent, nor does that limitation have any basis in the text of § 751(a). As the government notes, pretrial detention also serves a non-punitive function and does not serve as "a **substitute** for part of a prison sentence," and yet can be "custody" under § 751(a). App'x at 93 (emphasis in original). The district court's statement that the commencement of supervised release means the defendant "is no longer serving a sentence with the BOP," and thus has been released from the BOP's custody, does not advance our analysis. Id. at 94. The question is not whether Foster was in the BOP's custody but rather whether he was in custody by virtue of the district court's order. Nor is the question whether all defendants on supervised release are in custody regardless of the terms of their release, but rather whether Foster was in custody because of the residence requirement in the district court's order. Even though Foster's placement in the reentry center may have had a rehabilitative purpose, that does not limit § 751(a)'s broad scope because restrictions on liberty can also provide needed support while a defendant transitions back into the community.

11

when that person is in the Attorney General's 'custody,'" and arrest by a federal agent "necessarily places the individual in the agent's 'custody,'" and thus custody in these instances "does not turn on the particular location from which the individual escapes or the extent of physical restraint to which he is subject." Appellee's Br. at 14-15. Instead, Foster contends that custody "arises by virtue of the inherently custodial relationship between the individual and the government." Id. at 15.

According to Foster, given the broad discretion courts have in setting the terms of supervised release, the government's reading of § 751(a) would mean that "any time a defendant on supervised release is assigned to live in a particular place – whether a halfway house, his parents' residence, his last known residence, or even a particular town or district – he will be subject to . . . § 751(a), with a potential five-year statutory maximum sentence." Id. at 15-16. Foster argues that this reading of the statute is so broad as to provide no clear understanding of what conduct it prohibits, resulting in an unconstitutionally vague statute. Foster also points out that such a sweeping interpretation of custody in the context of supervised release would allow "arbitrary and discriminatory enforcement," with some prosecutors treating absconding from a residential placement as a separate crime, while others would be content to treat it merely as a grounds for revocation of supervised release. Id. at 16.

Foster's void-for-vagueness arguments are not persuasive. He provides no alternative definition of "custody" but rather he agrees with the government's contention that it is "the legal right to control [the individual's] actions or limit his freedom."

12

Appellee's Br. at 13 (quoting Appellant's Br. at 10-11).  There is nothing in this definition to indicate that the *reason* for placing controls upon a person is relevant.  See also Ko, 739 F.3d at 560 ("[A]nyone under 'immediate charge and control . . . exercised by a person or an authority' may be said to be in 'custody.'") (quoting Webster's 9th New Collegiate Dictionary 318 (1991)).  The only pertinent question is whether the district court's order did, in fact, give the court control sufficient to constitute custody.  Regardless of why the district court ordered Foster to reside at the halfway house, its order "unquestionably curtailed Foster's freedom," as the government states.  Appellant's Reply Br. at 8.

As applied to Foster, § 751(a) is not unconstitutionally vague.  "The Supreme Court has told us (repeatedly) that the relevant question in void for vagueness challenges is merely whether the defendant before us 'had fair notice from the language' of the law 'that the particular conduct which he engaged in was punishable.'"  United States v. Baldwin, 745 F.3d 1027, 1031-32 (10th Cir. 2014) (quoting Parker v. Levy, 417 U.S. 733, 755 (1974)).  The statute speaks of "any custody under or by virtue of any process issued under the laws of the United States by any court."  18 U.S.C. § 751(a).  Foster was ordered by the district court to reside at the reentry center as a condition of supervised release.  Foster knew where he was to reside, and for what period, and that he was not allowed to leave without prior approval.  Under these facts, Foster had fair notice his absconding from the reentry center would constitute escape under § 751(a).

Foster also argues § 751(a) is void for vagueness because "some federal

13

prosecutors may treat a defendant's absconding under such circumstances merely as a violation of supervised release, while others will pursue indictment under § 751(a)." Appellee's Br. at 16. But as the government points out, the standard is not whether the prosecutor has discretion but whether the law "impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." Buscho v. Shurtleff, 729 F.3d 1294, 1308 (10th Cir. 2013) (quoting Grayned v. City of Rockford, 408 U.S. 104, 108-09 (1972)). We agree that a prosecutor exercises prosecutorial discretion in determining whether to file charges against some individuals but not others, even when the individuals in question committed sufficiently similar conduct. But under § 751(a), once the prosecutor files charges, there is an "explicit standard[]" for determining whether the defendant is guilty of the charge. See id. The standard for whether the defendant was in custody turns on the degree of restriction place upon him. The application of this standard does not involve such wide discretion as to violate due process. Cf. United States v. Hunter, 663 F.3d 1136, 1141-42 (10th Cir. 2011) (holding that term "reasonable and prudent" in state statute regarding driving was not unconstitutionally vague). In contrast, as the government points out, were we to apply Foster's interpretation, we would inject substantial uncertainty into whether a charge under § 751(a) could be brought because it would require delving into the district court's subjective intent to determine the court's purpose for ordering the residential placement.

Foster also argues that a purpose-focused definition of custody is required by the

14

rule of lenity. He acknowledges that "'the rule of lenity only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute, such that the Court must simply guess as to what Congress intended.'" Appellee's Br. at 22 (quoting Barber v. Thomas, 560 U.S. 474, 488 (2010)). Foster's only argument, however, is that "any ambiguity about whether" a court order placing a supervisee in a halfway house would "constitute 'custody' . . . must be resolved in Mr. Foster's favor." Id. at 23. But any ambiguity does not rise to the level of a grievous ambiguity or uncertainty. Further, we find no ambiguity in the statute that would cause us to limit its scope by looking first to the court's intended purpose for the custodial placement. The statute includes "any custody," which encapsulates all court orders that place the defendant under sufficient restrictions to constitute custody under our precedent, regardless of the district court's underlying purpose in ordering the placement.

Foster contends that Sack, Burke, and United States v. Edelman, 726 F.3d 305 (2d Cir. 2013), can all be reconciled because we should differentiate between orders that "were aimed at *helping* the defendants" and those that "were aimed at curtailing the defendants' freedom." Appellee's Br. at 22 (emphasis in original). He argues Sack and Edelman both involved custodial orders because both defendants were ordered to live in a halfway house after violating terms of their supervised release by using drugs. This is in direct contrast, Foster argues, to his case and Burke, where the reason the defendant was placed in the halfway house was to provide "'a transition from custody to the community in a way that enables him to make a smooth transition, since he is essentially homeless.'"

15

Id. at 20-21 (quoting <u>Burke</u>, 694 F.3d at 1063).

Not only do we doubt that this distinction is accurate as a factual matter, but also, and perhaps most importantly, an intent to help a defendant is not necessarily inconsistent with an intent to restrict his freedom. Foster appears to imply that "intent to restrain" can be inferred only when the reason for the halfway house placement is vaguely punitive, and thus is in contrast to orders meant to aid the defendant by providing a place to live. However, we note that the general goal of supervised release is to assist the defendant, and that objective does not preclude restrictions on the defendant's freedom in order to provide sufficient structure and thereby increase the defendant's chance for a successful reentry into the community.

We therefore REVERSE the district court's order dismissing the indictment against Foster and REMAND for further proceedings consistent with this opinion.